(April 23, 1923.)

In the Matter of the Assessments of Benefits of the KING HILL IRRIGATION DISTRICT. KING HILL IRRIGATION DISTRICT, Respondent, v. CRASTER FARM & ORCHARD COMPANY, SUMMERS & FALK, JOHN J. McGINNIS, R. R. DUFFY, Appellants.

[221 Pac. 839.]

IRRIGATION DISTRICT—OWNERSHIP OF CANAL SYSTEM—FEDERAL LOAN— ASSESSMENT OF LANDS FOR BENEFITS—ESTOPPEL.

A party owning a paid-up water right and a proportionate interest in the inefficient canal system of a Carey Act project through its agents participated in the organization of an irrigation district for the purpose of obtaining a loan of $1,000,000 from the federal government to reconstruct and improve such canal system had notice of all subsequent proceedings by which such loan was obtained and offered no objection thereto, knew when actual work was begun on reconstructing and improving such canal system, and knew of the progress of such work for more than a year prior to the levying of assessments for benefits and offered no objection to such work or expenditure until the district court was petitioned to confirm such assessments more than a year after the work had begun and a large proportion of the loan had been expended and great benefits to the canal system had thereby been secured. *Held*, that such party is estopped to object to the assessment of benefits against its land to repay such loan on the ground that the irrigation district had not acquired ownership of the canal system prior to the levy of such assessments.

APPEAL from the District Court of the Third Judicial District, for Elmore County. Hon. Chas. P. McCarthy, Judge.

Petition to confirm assessment of benefits against lands in King Hill Irrigation District. Judgment for petitioner. Defendants appeal. *Affirmed*.

Richards & Haga, for Appellant Craster Farm & Orchard Co.

The construction company could not mortgage more than it owned, and on foreclosure only what was included in such mortgage was sold. (*Knowles v. New Sweden Irr. Dist.*, 16 Ida. 217, 101 Pac. 81.)

The federal government as the owner of the interest of such construction company has the right to enforce payments of such contracts for the purchase of water rights. (C. S., sec. 3021; *Adams v. Twin Falls etc. Co.*, 29 Ida. 357, 161 Pac. 322.)

The statutes of Idaho relating to irrigation districts require an irrigation district to own the irrigation system within its boundaries or construct a system before it acquires jurisdiction to levy assessments against the lands of water users for the purchase or contruction of an irrigation system. (C. S., secs. 4314, 4346, 4350, 4351, 4359, 4368, 4410; *Stimson v. Alessandro Irr. Dist.*, 135 Cal. 389, 67 Pac. 496; *Knowles v. New Sweden Irr. Dist.*, 16 Ida. 217, 101 Pac. 81; *Nampa & Meridian Irr. Dist. v. Briggs*, 27 Ida. 84, 147 Pac. 75; *Pioneer Irr. Dist. v. Walker*, 20 Ida. 605, 119 Pac. 304; *Pioneer Irr. Dist. v. Stone*, 23 Ida. 344, 130 Pac. 382; *Maynard v. Oregon & Nav. Co.*, 46 Or. 15, 78 Pac. 983, 68 L. R. A. 477; *Interstate Tr. Co. v. Montezuma Irr. Dist.*, 66 Colo. 219, 181 Pac. 123; *Bennett v. Twin Falls etc. Co.*, 27 Ida. 643, 150 Pac. 336; *Walla Walla Irr. Dist. v. Preston*, 46 Or. 5, 78 Pac. 982.)

The procceding in making the assessment contravenes the constitutional right of this appellant as to due process of law and equal protection under the law. (*Chicago, B. & Q. R. Co. v. Chicago*, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. ed. 979; *Duncan v. State*, 152 U. S. 377, 14 Sup. Ct. 570, 38 L. ed. 485; *Caldwell v. State*, 137 U. S. 691, 11 Sup. Ct. 224, 34 L. ed. 816; *Oury v. Goodwin*, 3 Ariz. 255, 26 Pac. 376; *State v. Ashbrook*, 154 Mo. 375, 77 Am. St. 765, 55 S. W. 627, 48 L. R. A. 265.)

Thompson & Bicknell, Chas. Stout, B. E. Stoutemyer and John C. Rice, for Respondents.

It is not necessary that an irrigation district hold legal title to an existing irrigation system in order to have authority to expend money and incur obligations in the construction of irrigation works necessary to furnish water to the lands of the district. An irrigation district is authorized either to construct works or to buy works, or both. (C. S., sec. 4346; *Bissett v. Pioneer Irr. Dist.*, 21 Ida. 98, 120 Pac. 461.)

Contracts for this purpose between the United States and irrigation districts are expressly authorized by statute. (C. S., secs. 4468–4492.)

This court has frequently upheld the authority of irrigation districts to contract with the United States to improve the water supply or the irrigation or drainage facilities necessary for the irrigation or reclamation of the lands of the district, and in none of these cases was it found necessary that the district hold or acquire legal title to the works to be employed as the means of furnishing the improved water supply. (*Pioneer Irr. Dist. v. Stone*, 23 Ida. 244, 130 Pac. 382; *Hillcrest Irr. Dist. v. Brose*, 24 Ida. 376, 133 Pac. 663; *Nampa & Meridian Irr. Dist. v. Petrie*, 28 Ida. 227, 153 Pac. 425.)

Appellant by its action in urging the officers of the district and of the United States to construct the very works which appellant now claims the district was without authority to construct is estopped to object to the assessment of its lands for its share of the expenditure, even if it were true that the district was without authority to contract for such construction and if all questions in regard to the validity of the contract, the authority of the district to make the same, and the validity of the obligation provided for therein had not been foreclosed by the decree confirming the contract. (*Page v. Oneida Irr. Dist.*, 26 Ida. 108, 141 Pac. 238; *City of Evansville v. Pfisterer*, 34 Ind. 36; *Jackson v.*

*Smith,* 120 Ind. 520, 22 N. E. 431; *Montgomery v. Wasem,* 116 Ind. 343, 15 N. E. 795, 19 N. E. 184; *City of Logansport v. Uhl,* 99 Ind. 531; *Stewart v. Board,* 45 Kan. 708, 26 Pac. 683; *Prezinger v. Harness,* 114 Ind. 491, 16 N. E. 495; *Baker v. Clem,* 102 Ind. 109, 26 N. E. 215; *Brosemer v. Kelsey,* 106 Ind. 504, 7 N. E. 569, and cases cited.)

"Having accepted the benefits, he will be deemed to have ratified the proceedings, whatever may have been their character." (*Kellogg v. Ely,* 15 Ohio St. 64; *Hathaway v. Payne,* 34 N. Y. 92.)

Appellant did not join issue on any of the material allegations of the petition, but admitted all the allegations either by express admission or by failure to deny, and then attempted to set up certain extraneous and immaterial matters by affirmative allegations. Such an answer raises no issue as to the material allegations of the petition and requires no more detailed finding of facts than if no answer had been filed. (*Black Canyon Irr. Dist. v. Fallon,* 21 Ida. 537, 122 Pac. 850.)

"The fact that the district did not condemn and purchase his water right is not a reason why his land would not be subject to assessment under the statute, if in any manner benefited by the organization of the district." (*Knowles v. New Sweden Irr. Dist.,* 16 Ida. 235, 101 Pac. 87, 91.)

Appellant having allowed its land to be included in the district and having failed to make any showing before the board of county commissioners and having allowed the organization of the district to be confirmed by decree of the court, cannot now attack the jurisdiction of the district to assess its lands, or be heard to claim that its lands will receive no benefit. (*Oregon Short Line R. Co. v. Pioneer Irr. Dist.,* 16 Ida. 578, 102 Pac. 904.)

DUNN, J.—In this proceeding, which was commenced in the district court af Elmore county, appellants are resisting the assessment of $65 per acre upon their lands which was levied by the directors of the King Hill Irrigation District as benefits to said lands from the expenditure of a large

amount of money, approximately $1,000,000, by the government of the United States in rebuilding, enlarging and improving certain portions of the canal system through which the lands of said irrigation district receive water.

King Hill Irrigation District embraces lands that were formerly included in the King Hill Carey Act project. The reclamation of this project was undertaken pursuant to a contract made by the state of Idaho with the King Hill Irrigation and Power Campany. The estimated cost of the reclamation of the lands included in the project was $600,000, but after the expenditure of this sum and a million dollars besides it was found that the system was so imperfect that the state was unable to show that an ample supply of water had been actually furnished to reclaim the lands embraced in the project and therefore was unable to secure patents for the land claimants, including appellants herein. The King Hill Irrigation and Power Company was without further means to fulfill its contract. It had mortgaged to the Continental and Commercial Trust and Savings Bank its interest in the canal system constructed by it, its water appropriation, its contract with the state of Idaho and its lien upon the water right contracts and lands of the contract holders who had not paid up in full, for funds with which to construct the irrigation system, and having defaulted in its payment of interest the mortgage was foreclosed and all of the construction company's interest in the mortgaged property, which was a lien thereon, was sold to the state of Idaho for $30,000. The deed conveying this interest to the state of Idaho was dated March 14, 1914. The appellants had paid in full for their water rights and thereby became the owners of such water rights and of a proportionate interest in the canal system. Their rights were therefore not affected by the foreclosure proceedings against the construction company.

In a memorial in 1915 the state legislature urged that Congress take over and complete the irrigation system because the same had not been completed in such a substantial manner as to entitle the state to patent to the land there-

under and at the same session appropriated $26,000 to assist in the maintenance of the irrigation system and furnishing water to settlers on the project. A like appropriation was made at the succeeding session of the legislature. While these appropriations by the state gave some temporary relief there was no hope that any assistance in the way of completing the canal system so as to reclaim the lands under it and make it possible to obtain patents could come from any other source than the federal government. The situation of the settlers was desperate in the extreme. Appellants, though their water rights were paid for, were as helpless as any other owners in the matter of obtaining water to insure crops and thus make possible title to the lands claimed by them. Appellant company was the owner of a water right at the head of the canal system, and of 1,200 acres of arid land near the lower end of the system at least 30 miles from the water, and the owner of one-twelfth of the intervening canal system which was utterly inefficient to convey the water to the land. The other appellants, with smaller interests respectively, were in a similar situation. The colossal proportions of the undertaking necessary to save the homes of the settlers as well as appellant company's investment of $78,600 and the investments of the other appellants may be easily understood by the sum asked and received from the federal government, $1,000,000.

In this situation the irrigation district, which is respondent in this action, was organized by appellant company and the settlers. At an election held in September, 1917, authority was given to said irrigation district to enter into a contract with the United States for the reconstruction, repair and improvement of the irrigation works for the irrigation of the lands of the district. This proposition was adopted by more than a two-thirds vote of the settlers and was approved by decree of the district court. Pursuant to this vote the contract was entered into by the irrigation district, the state of Idaho and the United States government, and as a result of said contract all of the interest of the state of Idaho in said canal system, which was a lien on

approximately an undivided eleven-twelfths of the whole, was conveyed to the government of the United States.

Pursuant to this contract work was begun by the government about March, 1918, and prosecuted apparently with diligence. Assessments for benefits were made by the board of directors of the Irrigation District, notice given to the settlers, no objection made to such assessments and petition for confirmation thereof was filed in the district court of Elmore county, October 1, 1918; an amended petition was filed November 26, 1918. The answer of appellant company was filed May 21, 1919, and this constitutes the first objection appellant company offered to the operations of the irrigation district, when a large part of $1,000,000 had been expended for its benefit and that of the other land owners.

Manifestly the conveyance to the United States was an attempt to comply with the act of Congress of June 17, 1902 (32 Stat. 388), and the act of Congress of Feb. 21, 1911 (36 Stat. 925), both of which are referred to in the contract and require, in such contracts as this, that title to the irrigation works be vested in the federal government. While the interest of the state was only a lien, it having simply succeeded to the construction company's interest, it fairly appears that all parties regarded the state as having title to the canal system. The contract voted on and approved by the settlers on the project, after due notice to appellant company and all others interested and without opposition from appellant company, contained the following:

"1. It is hereby agreed, that as soon as this contract shall have been duly authorized by the electors of the District, and the procedure in connection therewith confirmed by the court as legal and regular, the State, acting through the said State Board of Land Commissioners of the State of Idaho, for and in consideration of the benefits to be derived by the State from the construction, repair and improvement of irrigation works on the said project by the United States, and the sum of One Dollar in hand paid, the receipt of which is hereby acknowledged, will duly and

properly execute and place in escrow in the Overland National Bank of Boise, Idaho, . . . . a good and sufficient deed of conveyance, conveying to the United States all the right, title, and interest of the State in the said King Hill Project and the extension thereof known as the King Hill Extension Project, and the irrigation work in connection with said projects and all rights and appurtenances in connection with said projects or said irrigation works, including all water rights, water filings and water appropriations in connection therewith, the said deed to be delivered to the United States as soon as the operation of the said project shall have been turned over by the State to the District as herein provided, but in any event not later than December 31, 1918.

"2.  The State will continue to operate said project and the works thereof so long as sufficient funds remain available for that purpose out of the funds appropriated by the Idaho legislature at the Fourteenth Session for use in connection with said projects, and when such funds are exhausted, and in any event not later than December 31, 1918, will turn over the operation of all the works of said project below the headgates and headworks at the head of the main irrigation canal controlling the division of water between the power plant and irrigation system, to the District to be operated by the District in the manner hereinafter provided, and will turn over the operation and control of the said headworks to the United States."

In compliance with the foregoing provisions the works below the headgates were turned over to the district and the operation and control of the headworks to the United States.

The principal contention of appellants is that without first having acquired ownership of the canal system the irrigation district was powerless to levy a valid assessment of benefits on their lands.

Respondent's reply to this is "That the said Craster Farm & Orchard Company has stood by and acquiesced in and encouraged the said King Hill Irrigation District in its or-

ganization and in all of the proceedings taken to improve, repair and reconstruct the works of said irrigation district and the expending of funds in and about such work, and has received large benefits on account of such repair, improvement and reconstruction of said works, and is now estopped from claiming that said King Hill Irrigation District is without any title or ownership in and to the irrigation system, or that it has no right to operate, repair and reconstruct said system, and that it has no right or power to assess the lands tributary to said system for the purpose of raising money to repair, improve and reconstruct said irrigation system.''

In all of these proceedings, of all of which appellant company had notice, there seems to be no question that it was assenting to everything that was done. At least there is nothing in the record to indicate the contrary. While it claims that the proposition that it relied on was that the irrigation district should purchase the canal system, the fact remains that it knew it was not purchasing the canal system, but was borrowing money from the United States to improve said system, to be repaid by assessments on the lands of the district, and it had ample opportunity to object to its method of procedure if it had chosen to do so before the expenditure of any money whatever by the United States government. The contract voted on and approved by the settlers on the project contained this paragraph:

''6.    That subject to review and confirmation by the court, as provided by law, the Directors of the District will apportion the benefits of this contract equally per acre of irrigable land to each and every tract of irrigable land in said District for which water is to be furnished, but it is fully agreed and understood that the District as a whole is bound to pay to the United States the full amount herein agreed to be paid regardless of the default or failure of any tract in the District, or any landowners of the District in the payment of the assessment levied by the District against such tract, and the District will levy and collect extra assess-

37 Idaho.—7

ments and levies whenever required to make up for the default or delinquency of any tract of land or any landowners in the payment of assessments, so that in any event and regardless of any defaults or delinquencies in the payment of any assessments, the full amount due the United States shall be paid to the United States by the District when due."

If it be conceded that the irrigation district ought to have proceeded to acquire title to the canal system before entering into the contract with the federal government and before any of the funds obtained thereby were expended on the canal system and before attempting to levy the assessment for benefits, which we do not decide, we are of the opinion that under the situation disclosed by the record in this case it cannot be held that for this reason the assessments are invalid.

Appellants Summer & Falk, John J. McGinnis and R. R. Duffy expressly assented to the assessments levied by the irrigation district and thus have waived any right to object thereto. Judgment against these appellants should therefore be affirmed. While appellant Craster Farm & Orchard Company has not expressly assented to the levying of the assessments as the other appellants did, we think it is in no better position than they.

The irrigation system appears to have been owned by appellant company to the extent of about one-twelfth and by the other appellants herein, together with the settlers whose lands and water rights were subject to liens for the unpaid portion of their contracts, to the extent of about eleven-twelfths. The state's interest is the lien held by the construction company, which was sold under foreclosure. So far as the appellant company is concerned it is shown by the testimony of W. B. Slick, one of its two principal stockholders, to have had actual knowledge of the work being done on this canal system by the federal government from its beginning down almost to the day of the trial. Speaking of the construction work done by the government, he said: "I would like to state that in most of these instances

I have been there during construction and absolutely familiar with the conditions from time to time, from year to year, from the day that the first pick was ever struck in that ground till this present day, or the last week or so.''

The situation, then, is this: that the land owners of the district have, through the organization known as the King Hill Irrigation District, obtained a loan of approximately $1,000,000 from the United States and have permitted the expenditure of that sum for the improvement of the irrigation system of said land owners. Appellant company, as well as other owners, through its agents, had personal knowledge of every step taken by the government from the moment when the first work was done in rebuilding said system. No land owner other than appellants is now complaining, and appellant company, with full knowledge of the contract with the United States, of the work that was being done thereunder on the canal system in which it had a paid-up interest and of the fact that repayment of the loan from the United States must be made by assessments on the lands of the district, waited until the reconstruction and improvement had been going on for more than a year and until a vast amount of the appropriation had been expended for its benefit before offering the slightest objection.

There is no evidence in the record that justifies a holding that the lands of appellant company are entitled to an assessment different in amount per acre from the other irrigable lands of the district, and to hold that appellant company or any other land owner, under the facts disclosed in this record, may escape payment of assessments because the irrigation district has not acquired title to the irrigation system would be in the highest degree inequitable, especially in view of the fact that these parties have assented to a contract with the United States in which it was expressly provided that the assessments should be distributed equally per acre on all the irrigible lands of the district and that each acre of land should be bound not only for the original assessments against it, but for the assessments levied against

every other acre of land in the district in case the owner thereof should default in the payment of his assessments.

We think there is no doubt that a timely objection made by the appellant company would have compelled the cessation of work until title to the interest of appellant company in the canal system had been acquired, and appellant would have been entitled to payment of the reasonable value of said interest at that time. When we consider appellant company's helpless situation and that of all the other land owners on the project the reason it did not object is not far to seek. *Knowles v. New Sweden Irr. Dist.*, 16 Ida. 217, 101 Pac. 81, furnishes no parallel to this case. Not having spoken till practically all the benefits were secured, it is estopped to object to the assessments now on the ground that the district had not acquired ownership of the canal system. (*Hemenway v. Craney*, 36 Ida. 11, 208 Pac. 407.) It has no right to set off such value of its interest against the assessments in a proceeding of this kind, but would be required to resort to an independent action for whatever damage it has suffered by the taking of said interest, the value to be reckoned as of the time when the interest was taken.

Complaint is made that findings were not made on all material issues. While the trial court might have made findings more specific than it did, practically all of the errors assigned by appellant so far as the findings are concerned were matters as to which there was no issue before the trial court, all of them having been admitted. In this situation the findings made by the trial court are sufficient to support the judgment.

Complaint is also made by appellants that the federal government holds liens on lands and delinquent water contracts entered into under the Carey Act project sufficient in the aggregate to pay the money advanced by the United States, and therefore resort should be had first to the collection of such liens before an assessment is levied. It is sufficient to say that when they were acquired by the state

and turned over to the federal government it is well known that foreclosure of these liens would have brought practically nothing, and if anything could be realized now it is solely because of the government expenditure which has benefited appellants in the same proportion that it has the delinquents. Besides, if foreclosure were had appellants have no claim on anything that might be realized therefrom. If the government chooses for the present, or permanently, to waive this lien it does not concern appellants.

The irrigation law of this state provides for the issuance of bonds by an irrigation district for the construction or purchase of an irrigation system, and it also provides for a contract by which funds may be obtained from the United States government. The latter method is the one adopted by the district in this case. In view of the conclusion that we have reached and the reasons therefor we find it unnecessary to set out in detail the procedure for obtaining a loan from the federal government in cases of this kind, or to determine whether or not the procedure established by law has been strictly followed.

The judgment of the trial court should be affirmed as to all appellants, with costs to respondents.

Budge, C. J., and Wm. E. Lee, J., concur.

(December 31, 1923.)

ON REHEARING.

DUNN, J.—No reason appears for changing the views announced in the original opinion. The judgment of the trial court is therefore affirmed as to all appellants, with costs to respondent.

Budge, C. J., and Wm. E. Lee, J., concur.

WILLIAM A. LEE., J., Dissenting.—I have carefully examined the entire record in this case, and do not agree with the facts as stated or the conclusions reached in the majority opinion. Because I think it announces an unsafe and utterly untenable view with regard to the taxing power of irrigation districts and seriously impairs individual property rights, I deem it worth while to express my views.

The more important facts are as follows: In 1904 the state contracted with a Carey construction company to build an irrigation system, and procured from the government a segregation of about 15,000 acres of land to be reclaimed under the federal Carey Act. These lands are in Elmore county, near Glenn's Ferry, and the project is known as the King Hill irrigation system.

The original construction company was unable to carry out its contract with the state, and in 1908 the King Hill Irrigation & Power Company, having acquired its interest, made a new contract with the state to complete the system and reclaim these lands. The water was diverted from the Malad River near the northwest corner of Sec. 35, T. 6 S., R. 13 E., B. M., about thirty miles from the place of intended use. The system was completed by the construction company to such an extent that a partial distribution of water was made, and crops were thereby raised for about ten years prior to this controversy. A large part of the system consisted of wooden flumes, pipes and siphons laid along steep mountainsides and across deep gulches in a loose wash formation, so that when this soil was wet the foundations would slip, and therefore the canal was frequently out of repair and failed to furnish an adequate supply of water during portions of the irrigating season. Both the state and the government appear to have regarded the system as not sufficiently permanent to entitle the settlers on the project to patents for their respective entries, principally for this reason.

The construction company, with the consent of the state, mortgaged its entire interest before the system had been

accepted by the state or sufficiently completed to entitle the state to patent for the segregated lands. This mortgage was foreclosed under a decree of the federal court, and the interest of the construction company was purchased by the state for $30,000. From 1915 to 1918 it was maintained at the expense of the state by legislative appropriations. (Laws 1915, p. 79; Laws 1917, p. 7.) The state's original estimate of its cost was $600,000, but by 1915 there had been expended upon this system $1,600,000, and the legislature by Joint Memorial No. 5 requested the government through the reclamation service to complete the system. (Laws 1915, p. 417.)

Appellants, who own about 2,000 acres, having paid in full the purchase price for their respective interests in this system at the rate of $65 per acre, the price fixed by the state, were excluded from the foreclosure sale. Other settlers appear to have made only the initial payment of about $5 per acre to the construction company, and at the time of the creation of the alleged irrigation district and the assessment for benefits here complained of, these entrymen do not appear to have had any interest in this system except that which their possessory rights might give them.

In 1917, these settlers under this project voted to create an irrigation district and to contract with the government to expend not to exceed a million dollars in betterments. The district does not, and never has, owned any interest in the system, or taken any steps to purchase, condemn or otherwise acquire any interest therein. About ten-twelfths of the district was owned by the state through its purchase at the foreclosure sale, and the remaining two-twelfths is owned by appellants and perhaps a few others who have paid in full for their water rights.

In August, 1917, the reclamation department of the government, the state, and respondent irrigation district entered into an agreement wherein, among other things, it is agreed that the state shall quitclaim its interests acquired in the foreclosure proceedings to the government for the nominal consideration of one dollar; that the department

will expend not to exceed one million dollars in reconstructing and repairing this canal system; and that the district will repay this money by a levy of an assessment for benefits upon all the lands within the district.

C. S., sec. 4362, reads:

"Whenever the electors shall have authorized an issue of bonds as hereinbefore provided, the board of directors shall examine each tract or legal subdivision of land in said district, and shall determine the benefits which will accrue to each of such tracts or subdivisions from the construction or purchase of such irrigation works; and the cost of such works shall be apportioned or distributed over such tracts or subdivisions of land in proportion to such benefits; and the amount apportioned or distributed to each of said tracts or subdivisions shall be and remain the basis for fixing the annual assessments levied against such tracts or subdivisions in carrying out the purpose of this chapter. . . . . "

The sixth paragraph of the contract between the reclamation service, the state and the district, to construct these betterments to the system at a cost of not to exceed a million dollars, in part reads:

"The Directors of the District will apportion the benefits of this contract equally per acre of irrigable land to each and every tract of irrigable land in said District for which water is to be furnished. . . . . "

It thus appears that this district, through its directors, in advance of making the assessment, entered into an agreement to disregard the provisions of the statute which require that these assessments shall be made according to benefits, and not according to acreage. It would be interesting to know whether counsel who drew this contract, and who doubtless dictated its terms to the district, did so in ignorance of this provision of the law or in disregard of it, or in the belief that whatever might be done, it would be upheld by the state courts.

Appellants do not contend that they were adverse to the creation of an irrigation district, or to its entering into an agreement for the reconstruction and repair of this system

in which they were part owners, or that their interest should not be required to pay their rightful proportion of the cost of these improvements, or that the government should not be reimbursed for all of its expenditures in making these betterments, but they do contend that these proceedings should have been taken in accordance with law, which has not been done.

In *Nampa & Meridian Irr. Dist. v. Petrie*, 28 Ida. 227, 153 Pac. 425, this court, speaking through Budge, J., said:

"5. Where a contract is entered into between an irrigation district and the United States, providing, among other things, that arid lands within the jurisdiction of the irrigation district, in order to secure a full water right from a government project, shall be assessed not to exceed $75 per acre, such contract is subject to the laws of this state governing irrigation districts and to the apportionment of benefits thereunder, and the fixed charge to be assessed against the lands of any particular land owner within such irrigation district for such water right will be finally determined by the district court of the judicial district within which said irrigation district is located, as provided by secs. 2400–2403, Rev. Codes."

These sections are substantially the same as C. S., secs. 4363–4366.

Respondent district contends that appellants, other than the Craster Farm & Orchard Company, have by an agreement executed under seal expressly waived their right to question the validity of this assessment. I think this contention should be sustained, if the district in its incomplete state of organization has any authority whatever. But the situation of appellant .Craster Farm & Orchard Company is different. It owned a one-twelfth interest in the entire system, which it had purchased in accordance with the contract between the state and the construction company at a cost of $78,600, and had been in possession of such interest for approximately ten years as a tenant in common with the owners of the remaining interest, which after the foreclosure proceedings in the federal court was first the state, and

after it quitclaimed its interest, the government. The rights acquired by this foreclosure sale included all the rights of the construction company against the settlers who had defaulted in payment for their respective water rights, and constituted a majority holding. Neither those who created the district nor the district itself had or have since taken any steps to acquire the old system. The records in the state reclamation department show that in 1922, and since this appeal was taken, the government has patented to the state practically all of the lands in this segregation. From this it may be inferred that the system has now been sufficiently completed to warrant the issuance of patent to these settlers, and if so, those who have not paid anything upon the old system, and who are now permitted to receive their patents, should of course hold their rights subject to the payment of the cost of these improvements, but they should not be permitted to take over the interest of those who did pay for their interests in the original system, by the subterfuge of going through the preliminary steps of organizing an irrigation district, and thereafter share upon an equal basis rights in the new system.

The majority opinion does not claim that the proceedings taken by the respondent district were lawful, but invokes the doctrine of estoppel, which has no application here because appellant is now appearing and objecting at its first opportunity. Manifestly, it would have been an idle proceeding for it to have appeared before the irrigation board and objected to this assessment, first, because the board had already bound itself in an agreement with the reclamation department to levy this assessment according to acreage and not according to benefits, and secondly, because this board could not be expected to view the claim of appellant impartially, because of the interest of its members. For this reason, the statute makes the district court, in these proceedings to confirm, the proper tribunal to determine the rights of the parties.

The procedure followed by the irrigation district is so plainly in violation of the law governing irrigation districts,

and so manifestly inequitable, that it should be a matter of surprise that anyone would urge its justification. Among the sixty-nine points argued on behalf of respondent district, one is that the district having been in control of this system for more than five years, the statute of limitations has run against appellants. The statement that one who owns a paid-up interest in an irrigation system, as a tenant in common with the other owners, while he is in the possession of the use of the water, may lose his right by adverse possession, is not worthy of consideration.

The petition for the organization of the district states among other things that:

". . . . It is proposed to purchase irrigation works already constructed. . . . . "

C. S., sec. 4314, provides that:

"The petition (for the organization of a district) shall state whether it is proposed to purchase irrigation works already in operation or to construct new works."

The original irrigation district law, Laws 1895, page 183, at page 192, and all subsequent amendments to this law, make it perfectly clear that it was never intended that the organization of an irrigation district could be completed without such district acquiring some interest in the private property it was taking. By a convenient fiction of law, the proceedings to create a district are held to be *in rem,* which permits such districts to take the property of individuals without any personal service of process.

In addition to the taxing units that were recognized by the constitution, such as counties, cities, school districts and the like, the legislature has since provided for the creation of irrigation districts, drainage districts, highway districts, elevator and warehouse districts, and possibly other forms of taxing units, all of which exercise their right to tax the individual with such frequency that it is seriously impairing the right of the individual to own and control his property, and if further extended, must ultimately result in destroying the value of private property. The power of these taxing units should not be extended by judicial construction,

and an irrigation district should not be permitted to take over the interest of the individual in an irrigation district privately owned and merge the same into the property of the district, without paying any compensation to the owner for such property, and thereafter exercise the right to tax all of the property within the district upon the same basis that the property of those who had no interest in the original system is being taxed.

The constitutional guarantee of life, liberty and the pursuit of happiness includes the right to acquire and hold property, of which right the subject cannot be divested without due process of law or according to the law of the land, which was defined by Mr. Webster in the *Dartmouth College v. Woodward* case:

"By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property and immunities, under the protection of the general rules of society." (4 Wheat. (U. S.) 518, 4 L. ed. 629.)

This government has steadfastly refused to recognize certain foreign governments, largely for the reason that the laws of such foreign governments do not protect the property rights of the individual, but hold that all property belongs to society in general, and may be taken from the individual for the use of the majority, without compensation.

In the instant case, the method of taking appellant's property in this Carey project for the purpose of creating an irrigation district that would contract with the government to reconstruct the same, and charge the cost of such reconstruction to all users alike, may be a somewhat more indirect and refined method of taking property without due process of law than that practiced by the soviet governments, but it nevertheless results in taking the property of the individual, without compensation and against his will, for the benefit of the majority. This is a practical application of the socialistic theory of property rights carried out

in its most objectionable form, and has no place under a constitutional form of government which is intended to protect the rights of the minority as well as the majority.

I think the judgment of the court in confirming the assessment made against this appellant's land should be reversed, and this district required to proceed in accordance with the plain intendment of the statute.