[Civil Nos. 2879, 2888, 2889. Filed July 15, 1930.]

[289 Pac. 979.]

ASA F. POST, Appellant, v. WAYNE T. WRIGHT, Appellee.

J. L. TERRY, A. F. POST and BERT CAUDRY, Appellants, v. J. H. ROLL, J. X. CHRISTENSEN, WAYNE T. WRIGHT and H. E. CHAFFEE, Appellees.

MOHAWK MUNICIPAL WATER CONSERVATION DISTRICT, a Corporation; J. L. TERRY, A. F. POST and BERT CAUDRY, as Directors of the Said MOHAWK MUNICIPAL WATER CONSERVATION DISTRICT; M. L. FREEMAN, HOWARD COMEY, VICTOR HOVATTER, GEORGE SCHMIDT and RICHARD ROE, Appellants, v. J. H. ROLL, J. X. CHRISTENSEN, WAYNE T. WRIGHT and H. E. CHAFFEE, Appellees.

No. 2879.—

Nos. 2888 and 2889.—

Mr. Peter T. Robertson and Messrs. Chalmers, Fennemore & Nairn, for Appellants.

Messrs. Kibbey, Bennett, Gust, Smith & Lyman, and Mr. Glenn Copple, for Appellees.

ROSS, J.—We think these three cases might better have been presented separately. They concern the affairs of the Mohawk Municipal Water Conservation District, in Yuma county, Arizona, but the questions involved in each is enough different that a separate statement of the facts, the propositions of law, and the assignments of error would have much facilitated our work. However, they are presented in consolidated form and in their consideration we shall be guided accordingly.

We will, as counsel have, take them up in their reverse order, but before we state the cases will say

the Mohawk Municipal Water Conservation District is nothing more or less than an irrigation district (and we will refer to it as such), organized under the laws of Arizona.

The plaintiffs in each case are land owners, taxpayers, and qualified electors in the irrigation district, and prosecute these several suits as such.

In case 2889 the defendants are the irrigation district, J. L. Terry, A. F. Post and Bert Caudry, its board of directors, and M. L. Freeman, Howard Comey, Victor Hovatter, George Schmidt, Douglas A. Lindley and Mary B. Lindley. The complaint in this case alleges as a cause of action that the irrigation district, acting by and through its board of directors, acquired from the Lindleys 35 acres of land by condemnation proceedings, ostensibly "to be used and occupied for district purposes and for the erection thereon of office buildings, warehouses and other buildings and structures and side-tracks and for the storage thereon and in said warehouses and buildings of district supplies and materials and for the loading and unloading thereon of such supplies and materials and for the housing of the employees and servants of said district, and for all other district purposes," whereas in fact such land was acquired for town site purposes; that said board of directors after acquiring the land laid it out as a town site, surveyed and platted it into small parcels or lots and sold and conveyed by deeds lots to defendants Freeman, Comey, Hovatter and Schmidt, and were selling and advertising for sale the remaining lands. The relief asked was (1) that the judgment of condemnation be set aside and held for naught; (2) that the irrigation district be compelled to reconvey said land to the Lindleys and return the purchase price to its treasurer; (3) that defendants irrigation district and directors be enjoined from selling any more of its land; and

(4) that the deeds conveying lots to Freeman and others be set aside and held for naught.

In case 2888 the plaintiffs set out in their complaint practically the same facts as alleged in 2889, and averred that the board of directors of the irrigation district had spent large sums in platting, surveying and improving said premises as a town site and in advertising the same for sale. The relief asked is an accounting by the board of directors for such sums so spent, and that they be enjoined from spending any more money for such purposes.

Case 2879 is so different in its facts that we pass it for the present.

Defendants in 2889 and 2888 made the point that plaintiffs' interests as taxpayers and land owners in the district did not entitle them to maintain the action. As we shall later show, we think this contention is untenable. Defendants also defended on the ground that what was done in improving, platting and selling said land was legal.

By the judgment in case 2889 the irrigation district and its board of directors were perpetually enjoined from selling or disposing of any of said land, except as authorized under the laws of Arizona, regulating and defining the powers and authority of irrigation districts, now in force or which may be hereafter enacted. The deeds to Freeman, Comey, Hovatter and Schmidt were adjudged to be void and the irrigation district directed to restore to such parties the purchase price upon a conveyance by them to the district and a surrender of possession of the lands sold to them.

In case 2888 the accounting showed the board of directors of the irrigation district had expended, in improving, surveying, platting and advertising the property, the sum of $960.46, funds of the district, and judgment was entered against each of them in favor of the district for that amount. The board of

directors was also enjoined from taking any further steps towards selling any of said lands.

From these judgments the defendants, except the Lindleys, have appealed. The action against the Lindleys was dismissed by plaintiffs during the trial, and therefore the judgment did not run against them. After such dismissal of the Lindleys, all further proceedings were had upon the theory that the 35 acres in question were the absolute property of the irrigation district, acquired lawfully and for the purposes of the district as defined by the laws of its creation. And this we think was the correct attitude to take. It can make no difference, as we look at it, what may have been the motive of the officers of the irrigation district in acquiring for the district this acreage. When this proceeding was instituted the land belonged to the district, and not the manner or reason of its acquisition, but the power of the district to dispose of it in the manner undertaken is what concerns our inquiry. The material facts are not in dispute; they are, as they appear from the pleadings and evidence, as we have stated them, and in addition thereto, as follows:

On June 12, 1928, the irrigation district acquired, for the consideration of $2,602.50, the 35 acres in question from the Lindleys, for the purposes set forth above. On July 17th the board of directors passed the following resolution:

"Whereas, the District is the owner of all the southeast quarter of the southeast quarter, Section 3, Township 8, Range 17, Gila and Salt River Base and Meridian, except that portion of said tract owned and occupied by the Arizona Eastern Railroad Company's right of way, to-wit: 5.282 acres in the southwest corner thereof; and whereas, not all of said land being required by the District for the erection of office buildings, warehouses and side tracks, and for the storage of supplies and materials, and for the housing of the employees and servants of the District; and

whereas, the District engineer has surveyed the said tract of land, subdividing it into lots and blocks, alleys and avenues, and it seems to the board of directors that it will be advantageous for the District to dispose of such portion of said tract of land as is not required for the purposes above enumerated, and that a better price can be obtained therefor if the streets, alleys and avenues shown on the survey of the District engineer above mentioned are dedicated to the public use, and the land sold in lots and blocks; now, therefore, be it resolved that the said tract of land be officially subdivided in accordance with the said survey of the District engineer; that the District make the necessary dedication of the streets, alleys and avenues to public use, and that the District sell to the public the lots and blocks of the said subdivision at the following prices: (Here follows a description of the lots, together with the prices at which they were to be sold, aggregating the sum of $5,090.00.)

"Be it further resolved that the directors sign, and cause to be sealed with the corporate seal, and delivered, deeds to purchasers of the above described lots and blocks at the prices indicated, said deeds to contain the usual covenants and warranties, and that such a plat of the said subdivision can be officially placed of record with the Recorder of Yuma County, State of Arizona; that the deeds describing (describe) the land conveyed not only in reference to the lots and blocks of said subdivision, but by metes and bounds and courses and distances."

The validity of this resolution and what was done under and in pursuance of it are questioned. After deducting the purchase price of the land, $2,602.50, and the costs of improvements, $950.46, if the lots had sold for $5,090, the sum proposed in the resolution, the district would have been a gainer of $1,500 in cash and about ten acres in land. It is not questioned that the portion proposed to be sold was not needed for the district, nor that what was left after such disposition was not ample for the purposes of the district.

The irrigation district was organized under chapter 149 of the Laws of 1921, and the amendments thereto, found in chapter 6 of the Laws of 1922 (Special Session), known as the irrigation district law. These laws provide for the organization of land owners, desiring to provide water to irrigate their lands, into an irrigation district, and set forth in great detail the steps to be taken to accomplish that end, and also define the powers of such district after it is established. Under such law the district's general powers are vested in and are to be exercised by a board of directors elected by the qualified voters of the district. Section 1 of said chapter 149, as amended by chapter 6, section 1, *supra,* provides that when a district is organized, "such district shall have the powers conferred or that may hereafter be conferred, by law, upon such irrigation district."

Section 5 (a) thereof, as amended by chapter 6, section 6, *supra,* makes the board of directors the managers and conductors of the affairs and business of the district, authorizes and empowers them to execute all necessary contracts, deeds, and conveyances, and to employ agents, attorneys, and employees. Therein is this language:

"To accomplish the purpose of the district as proposed by the petition submitted for the formation thereof, the board shall have power to purchase or acquire, water rights, acquire or lease real estate and personal property, when necessary for its purpose, to acquire and hold stock in irrigation ditch and reservoir companies and to lease, sell and otherwise dispose of real estate and personal property, to construct, acquire, purchase, any and all canals, ditches, reservoirs, reservoir sites, water, water rights, rights of way, or other property by it deemed necessary for the use of the district, and power to acquire the right to enlarge any ditch, canal or reservoir, already constructed or partially constructed; also power to provide for the construction, operation, leasing and control of plants for the generation, distribution, sale and

lease of electrical energy, including sale of municipalities, corporations, public utility districts, or individuals, of electrical energy so generated. . . . ''

It is of course obvious from this language that the exercise of the power to sell real estate and personal property of the district must be ''to accomplish the purpose of the district as proposed by the petition submitted for the formation thereof.'' Petitions for the organization of districts must always indicate the purpose of the organizers to be to provide water for the irrigation of their lands. To that end the board may acquire real estate and personal property and to that end lease, sell, or otherwise dispose of real estate and personal property. When necessary for the district's purposes the board may do these things.

As the managers and conductors of the district's affairs and business the members of the board are necessarily endowed with a discretion to determine whether the necessity exists to purchase for its use or to sell any real estate or personal property, and when the board of directors has determined that the purpose of 'the district will be subserved by selling, leasing or otherwise disposing of some of its unneeded real estate, that exercise of discretion, unless clearly an abuse of power, will not be reviewed by the courts. As before indicated, no contention is made that the district needed or could profitably use the whole 35 acres, or that the 10 acres left was not enough for its purposes, the contention being that because the district had the 35 acres it had to keep it. It could not sell the land because it was acquired for its purposes and therefore must be kept whether needed or not. If this contention is correct the district could not sell, lease or otherwise dispose of it. Not needed, it would lie idle, produce nothing, pay no taxes. Besides the express legislative au-

thority given to the board of directors to sell real estate, when a sale is to accomplish the purpose of the district, we think the rule with reference to irrigation districts is the same as that applicable to municipal corporations generally, and is stated as follows:

"The power of the municipality to convey property is generally declared to be equal to its power to acquire it; and so, where land is acquired for a special purpose, as soon as that purpose is served, and the corporation has no further use for the property, it may be converted to another use or disposed of by the municipality." 43 C. J. 1343, § 2100.

Appellees, however, say that section 9 of chapter 149 was derived from section 13 of the Wright Act of California (Stats. 1887, p. 29), and that the courts of that state have construed such section as a prohibition against the district's selling its real estate even when no longer needed for its purposes. This was indeed the holding in *Tulare Irr. Dist.* v. *Collins*, 154 Cal. 440, 97 Pac. 1124, 1125, but the court expressly based its decision on the ground that the legislature had failed to provide for such a contingency. It was there said:

"If this contingency had occurred to the Legislature, it is reasonable to suppose that it would have made some provision to meet it, would have provided for sale, would have authorized execution and levy, or by some appropriate expression have relieved such land from the terms of the strict trust which it has imposed. But, in the absence of such expression, these lands stand in precisely the same position as do the other lands of the district."

Were our irrigation district law like California's was when this decision was written, we would feel bound by it and other cases of like import construing their statute, but in chapter 149, *supra,* is express legislative authority to lease, sell, or otherwise dis-

pose of real estate belonging to the district when no longer necessary for its purposes.

It goes without saying that an irrigation district may not enter into the business of laying out and promoting town sites. Such business is foreign to any of the purposes for which it is organized. It must confine its activities primarily to the business of providing water for its land owners. Incidentally it is given power to install electric plants and to sell electricity to municipalities, corporations, public utilities and individuals, and also power to sell its real or personal property when no longer needed for its purposes as an irrigation district. We think unquestionably under the statute the board of directors could have legally sold in a body the portion of the 35 acres no longer needed for its purposes, either before or after improving it, and turned the consideration over to the district's treasury for its general purposes; and, if it could do that, it would seem the cutting of such portion into lots or small parcels, with streets, avenues and alleys, for the purpose of enhancing the land's value and obtaining for the district a better price, would not invalidate the sale of such lots or parcels. The status of the so-called streets, avenues and alleys may not be what was intended, but that cannot affect the validity of the deeds of conveyance to Freeman and others. We are satisfied that the scheme or plan adopted by the board of directors to dispose of that portion of the 35 acres no longer necessary for the district's purposes was within the powers conferred upon the district by chapter 149, *supra,* and amendments thereto.

It seems to us that the action of the board of directors in clearing, leveling, surveying, platting and improving the premises to make them more attractive to purchasers, as well as advertising the lots for sale,

was the exercise of powers conferred upon them by the irrigation district law. The statute, section 5(a), reads as follows:

"The board shall have power, and it shall be their duty, to . . . manage and conduct the affairs and business of the district. . . . "

It would indeed be a very inefficient and inadequate management if one empowered and charged by its owner with the duty of selling real property should place it on the market in its raw state, when by dressing it up with a small outlay such property would sell for enough over and above the outlay to net the owner a good profit. We think the power and duty "to . . . manage and conduct the affairs and business of the district" carries with it a reasonable discretion, when that power is about to be exercised in the disposition of some of the property of the district, to do what shall reasonably appear to make the land more attractive to purchasers. It certainly would be very inequitable to permit the irrigation district to reap the accrued profits by reason of the improved condition of the land and not bear the expense of such improvement, especially where, as here, there is no question of the good faith, good judgment, or honesty of the board in causing such improvements to be made. To give the district the enhanced value caused by the improvements and relieve it of the costs would violate all rules of equity. Such would be the law's sentence, however, if the board had no discretion in the matter. If it did have the discretion, then no judgment should be entered against its members. We conclude that what was done by the board to enhance the value of the property and to facilitate its sale was well within its discretion in the management and conduct of the affairs and business of the district.

While the plaintiffs ought not to prevail on the merits of the cases 2889 and 2888, we think their interests as taxpayers and land owners in the district entitle them to maintain the suits. It should not be forgotten that irrigation districts are organized for the direct private benefit of their land owners and taxpayers. As such, they are required to help pay for the irrigation system and are entitled to a proportionate share of the water for irrigation of their lands, as also any profits accruing from the operation of the system. They are directly concerned in the proper application of the district's funds and also in the distribution of its benefits. *Merchant's Nat. Bank* v. *Escondido Irr. Dist.*, 144 Cal. 329, 77 Pac. 937; *Tulare Irr. Dist.* v. *Collins, supra.* These cases hold, and we think very correctly, that the land owner has a real proprietary interest in the district's property. That being so, he is entitled to invoke the powers of the courts to restrain its dissipation.

The judgments in these two cases are reversed and the causes remanded, with directions to set aside and vacate the judgments therein, and to enter judgments in favor of the defendants.

We now consider case No. 2879. This action is one to determine the right to the office of director of division No. 3 of the Mohawk Municipal Water Conservation District. An election to fill such office for a term of three years, beginning January 1, 1929, was held November 13, 1928, the candidates being Post and Wright. The canvass of the votes showed that Post received ten and Wright seven votes, and the board of directors accordingly declared Post elected. He thereafter, and within the time allowed by law, duly qualified by taking the necessary oath and filing bond, and on January 1, 1929, took possession of the office. On April 2, 1929, Wright filed a complaint or information in the nature of *quo war-*

*ranto,* under section 4407 of the Revised Code of 1928, alleging that he was a duly qualified elector of said division No. 3 and that he received at the November election the highest number of legal votes for the office of director; that Post has usurped, intruded into and unlawfully holds and exercises such office. Specifically he alleged that six of the votes received by Post were cast by Charles G. Norton, Howard Comey, M. L. Freeman, Mrs. M. L. Freeman, Victor Hovatter and George Schmidt, who were not qualified electors because they did not possess the necessary property qualifications; that is, they did not own land and were not land entrymen as required by section 1 of chapter 149 of the Laws of 1921 and amendments thereto.

The defendant's answer raised the sufficiency of the complaint to state a cause of action, also challenged by denials and affirmative averments the allegations of the complaint. The demurrer was overruled and trial resulted in judgment for plaintiff, together with damages in the sum of $30. Post, the defendant, has appealed.

It is contended plaintiff's complaint fails to state a cause of action because it does not show that plaintiff ever qualified by taking the oath and filing bond within the time and in the manner prescribed by law. In support of this contention we are referred to that provision of the state Constitution that extends the term of every officer until his successor is elected and qualified, section 13, article 22. This has no application to the present facts. The same is true of a like provision, also relied upon, in section 4 of chapter 149, *supra,* referring to the tenure of office of members of the board of directors of irrigation districts.

It is also said plaintiff did not comply with sections 64 and 68 of the Revised Code of 1928, as to filing

oath and bond. The first of these sections provides that the oath of office must be taken, subscribed, and filed within ten days after the officer has been notified of his appointment, or if elected, at any time after receiving his certificate of election, and at least one day before the commencement of the term of his office. By section 68 the bond must be filed within the time prescribed for filing the oath. It is readily seen that these provisions apply only to officers appointed, or if elected, to the one receiving the certificate of election. In *People* v. *Miller,* 16 Mich. 56, a like question was before the court, and it was there said:

"We find nothing in any of our statutes warranting the inference that the Legislature ever contemplated requiring any person, claiming to have been elected to an office, to take the oath or file the bond, while another person, holding the certificate of election, is in possession of the office under the certificate, refusing to yield to the claim, and the right has not yet been tried.

"The bond in this case was to be given to, and approved by the Board of Supervisors, who had already taken the bond of the respondent for the same office. He held the certificate upon which alone they had the right to act, while he persisted to claim the office under it and had qualified, or was ready and willing to qualify under it. . . .

"As to the oath, no person can reasonably be required to swear that he will perform the duties of an office, out of which he is thus kept by another, and which it is yet uncertain whether he can ever obtain."

See, also, *Ledbetter* v. *Reese,* 147 Ga. 710, 95 S. E. 209; *Little* v. *State,* 75 Tex. 616, 12 S. W. 965; *Buchanan* v. *Graham,* 36 Tex. Civ. App. 468, 81 S. W. 1237; *Griffith* v. *State,* (Tex. Civ. App.) 216 S. W. 469; *People* v. *Mayworm,* 5 Mich. 146; *Board of Auditors of Wayne County* v. *Benoit,* 20 Mich. 176, 4 Am. Rep. 282. The complaint was not defective in fail-

ing to show the plaintiff had taken the oath of office and filed bond.

The witnesses Norton, Comey, Freeman, Mrs. Freeman, Hovatter and Schmidt were permitted to testify, over the objections of defendant that such testimony violated the secrecy of the ballot, that they voted for defendant. It seems the majority rule is that voters may not be compelled to testify how or for whom they voted, 20 C. J. 246, § 339, but the weight of authority is also that the privilege is personal to the voter and he may waive it if he so elects, id., § 340. The witnesses did not claim the exemption and under such circumstances their testimony was properly admitted.

The more serious question is whether these witnesses, it being settled the only land they owned in the district was residence lots, were qualified voters. A qualified elector is defined by section 3 of chapter 149, *supra,* to mean persons who have possessed the property qualification, provided in section 1 of the act, for ninety days immediately preceding the election, and who have resided continuously for six months immediately preceding the election in the county in which such district or part thereof may lie. The property qualifications are defined in said section 1 as "the holders of title or evidence of title, including receipts or other evidence of the rights of entrymen on lands under any law of the United States or of this state to lands in any district." If this language be taken literally, Norton, Comey, the Freemans, Hovatter and Schmidt possessed the property qualifications prescribed, for they were, as we have heretofore held, "the holders of title to land in the district." We think, however, in determining what is meant by property qualifications we should look to the whole irrigation district law. It must be admitted that the primary purpose of this law was to permit land owners to organize an irrigation district

to obtain water for the irrigation of their agricultural lands, lands of little or no value without water but which the owners or possessors expect to make very valuable for the production of crops by the application thereto of water. To attain this end the law provides that the organizers may construct or may acquire by purchase an irrigation system through which the "desired" water may be conveyed on their lands for irrigation uses and in aid of their efforts to grow crops thereon. If we have correctly divined the purpose of the legislature in authorizing the formation of irrigation districts, and of the organizers thereof, persons not holding title or evidence of title to agricultural land, or not being entrymen of agricultural land under the laws of the United States or the laws of the state, even though they might own a residence or business lot, would not be interested in the organization of the district or its operation thereafter, because such lot, by reason of its smallness and the use to which it is devoted, would not permit it to be cultivated profitably or at all for crops. Among those named who may participate in the organization of an irrigation district and its affairs thereafter are entrymen of lands under the laws of the United States and of the state. Entries of these kinds are always of some legal subdivision of a section of land, usually forty acres or some multiple thereof, as agricultural lands are generally divided. While such a designation would not necessarily give the same character to the other qualified property owners named, it does tend to show that the purpose of the act was to permit the organization of districts to provide for the irrigation of agricultural lands in sizable bodies susceptible to irrigation.

Our irrigation law is derived from what are known as the Wright and Bridgeford Acts of California. Stats. 1887, p. 29, chap. 34; Stats. 1897, p. 254, chap.

189. While the general outlines of these acts is followed by our irrigation law, the latter differs from the California laws in very many details. However, in the matter of the property qualification there is a close similarity, enough so that we think decisions of the courts of that state should be persuasive as to the construction we should place upon our statute. In *In re Central Irr. Dist.*, 117 Cal. 382, 49 Pac. 354, 359, it was decided that owners of small residence lots in towns and cities were not such owners of land as are qualified signers of a petition for the organization of an irrigation district, within the meaning of section 2 of the Wright Act. The court there said:

"The Wright act contemplates the formation of irrigation districts to improve the condition of farming lands by bringing water upon them. As in reclamation districts the purpose is to improve the lands, by carrying off the surplus water, so here it is to better the farming property, by conveying the necessary supply of water to the soil. Where a statutory provision is open to construction, the test of the reasonableness of any given construction is what may be done with it. It is necessary, says Chief Justice Shaw, to put extreme cases to test the principle. Bearing in mind that the purpose for which irrigation districts are permitted to be organized is for the improvement of agricultural lands, if it be held that the owners of lots within incorporated cities or towns are qualified signers to the petition for their formation, then the machinery for the organization of such a district might be set in motion by 50 owners of small town lots, either in part or wholly covered by residence and business houses. These 50 would embrace within the boundaries of their proposed district vast tracts of farming land, the owners of which might be to the last degree unwilling that such a district should be formed. By including also within the boundaries of their contemplated district the little town in which their lands were situated, they might easily, and probably would, at the election, outvote the opposing owners of the agri-

cultural lands who might chance to be electors; and thus it would result that by the petition of townspeople only indirectly interested in the district, and by the vote of other townspeople not property owners at all, and therefore at the most very remotely concerned in the matter, thousands of acres of farming land, despite the protests of the owners, would be subjected to the burden and expense attending the organization and conduct of such districts. For it is a matter of common knowledge, and part of the history of the records of this court, that in some of these districts liens to the extent of 40 and more dollars have been imposed upon every acre of land despite the protests of its owners. Such is not the meaning of the act, nor should an interpretation be given to it which would make such practices possible. Qualified signers to the petition must be the *bona fide* owners of agricultural land, desiring to improve the same by conducting water upon it. To the use of the word 'desire' employed by the statute some force must be given. It is unreasonable to suppose that a man whose lot is covered by a drug store, another upon whose lot is a blacksmith shop and a corral, a third upon whose lot is a residence and the usual shrubs and bushes of a flower garden, 'desire' to irrigate their lands, in the sense of the word as employed in the Wright act."

The rule here announced, indeed, permits a forced contribution of taxes from the owners of lots in towns on the basis of valuation, and in a sense violates the principle of taxation without representation. Under the Wright Act, section 18, tax contributions were upon the value of real estate and might, therefore, because of the higher value of town lots and the improvements thereon, amount to a considerable sum. Under our chapter 149, *supra,* section 13, and subdivision (d), section 15, the tax contribution is on the basis of acreage, and not value. Therefore the owner of a piece of land for home or business purposes would contribute only a nominal sum. The lots owned by the voters Norton and others, being

for residence purposes, were taken out of the category of agricultural lands and, therefore, their ownership did not qualify such owners to vote.

Defendant complains of the judgment for $30 damages; says no damages were proved. The plaintiff was kept out of the office from January 1, 1929, up to the time of the trial and judgment, June 27, 1929. There is attached to the office of director a salary of three dollars per day while attending meetings and while engaged in official business under order of the board, and mileage and actual expenses. Section 22, chapter 149, *supra*. This compensation was denied plaintiff during the time mentioned, and we cannot say the damages of $30 were not justified. The statutes provide that damages may be awarded the contestant if successful in this kind of proceeding. Section 4408, Revised Code of 1928; 22 R. C. L. 722, § 44.

We think the judgment in this case should be affirmed, and it is so ordered.

LOCKWOOD, C. J., and McALISTER, J., concur.