IN THE MATTER OF THE PETITION OF THE BOARD OF DIRECTORS OF WILDER IRRIGATION DISTRICT for the Examination, Approval and Confirmation of its proceedings for the execution of that proposed contract "Concerning Construction of Anderson Ranch Reservoir and Related Matters" between the United States of America and the Wilder Irrigation District, Approved by the Secretary of the Interior January 13th, 1941, Respondent, v. J. M. JORGENSEN, LEWIS E. GRIFFITHS and CHARLES P. KAUFMAN, on behalf of themselves and all persons similarly situated, Appellants.

[136 Pac. (2d) 461.]

Rehearing denied May 3, 1943.

J. B. Eldridge for appellants.

J. M. Thompson, Walter Griffiths, W. B. Davidson, and B. E. Stoutemeyer for respondent.

HOLDEN, C.J.—February 13, 1906, a contract was entered into between the Payette-Boise Waters Users Association and the United States for the construction of a Federal

Reclamation Project, known as the Boise project. Some years thereafter, to-wit, December 19, 1925, the Wilder Irrigation District was organized. Shortly thereafter, April 6, 1926, a contract was entered into between the United States and the District, subject to later authorization by the electors of the District, as well as to later judicial confirmation, for the acquisition of the Boise Project by the payment of the costs to the United States of the construction of that project, as in the last mentioned contract provided. Following the approval of the contract by the electors of the district, a confirmatory decree was entered April 6, 1926.

The 1926 contract established a Board of Control [nine in number] to act as the operating agent of the main canal of the Arrowrock Division of the Boise Project, through which the New York Canal [now the New York Irrigation District], Nampa and Meridian Irrigation District, Boise-Kuna Irrigation District, Wilder Irrigation District and Big Bend Irrigation District [in Oregon] receive water. Members of the Board of Control were and are elected by the Boards of Directors of the respective districts from among their own members, and representation on the Board of Control was fixed on an acreage basis. Under the terms of the contract involved in this suit, the provisions of the 1926 contract providing for a Board of Control are made applicable insofar as the control and distribution of water are concerned.

It was found, in the course of time, the water supply provided under the terms of the contract between the United States and the District, dated April 6, 1926, was not sufficient for the proper irrigation and reclamation of the lands within the district. That led the district to take steps to obtain additional water and to that end, the district entered into another contract with the United States, dated January 13, 1941, also subject to later authorization by the electors of the district, for 33 71/100 per cent of water to be stored in the Anderson Ranch Reservoir to be constructed by the United States. This second contract was likewise approved by the electors. Thereafter, to-wit, May 6, 1941, a petition, in the usual form, was filed in the District Court of Canyon County praying that "each and all of the proceedings had and taken by the Board of Directors of Wilder Irrigation District, for and in connection with the special election held in said District on April 7th, 1941,

in the authorization of the execution of that approved contract 'concerning the construction of Anderson Ranch Reservoir and related matters', between the United States of America and said Wilder Irrigation District, approved by the Secretary of the Interior, January 13th, 1941, and approved and ordered filed by said District's Board of Directors, February 4th, 1941, be examined, approved and confirmed by this court, and that the legality and validity of the said contract be determined and established by decree of this court."

At the conclusion of the submission of proof by the District in support of its petition, it was stipulated by counsel for the respective parties that "the following questions shall be submitted to the court for its decision:

"(a)  Does the Wilder Irrigation District and its Board of Directors have the power and authority to enter into the contract sought to be confirmed in this action, in so far as the same relates to the Board of Control as referred to in said proposed contract?

"(b)  Has the Wilder Irrigation District, or the Board of Directors thereof, the power or authority to enter into the proposed contract insofar as the same provides by paragraph 43 thereof for the right to substitute, at some future time, waters to be diverted from the Payette River or from the Salmon River into the Boise River above Diversion Dam, as provided for in said contract?"

An examination of the record discloses these questions are also presented to us for decision.

It may be stated at the outset appellants do not contend respondent has not fully performed each and every act required to be done or performed by it under the applicable provisions of the statute; nor do appellants question the need and necessity for an additional and supplemental water supply; nor that the cost of acquiring additional water is unreasonable. Whether, then, respondent Wilder Irrigation District has power to enter into the contract sought to be confirmed in this action, depends upon whether the statute authorizes it to do so. In 1917, our legislature enacted a statute providing for the cooperation of Irrigation Districts with the Federal Government in the reclamation of arid lands [Title 42, Chap. 18, Cooperation With Federal Government, 2 I. C. A., p. 1568]. We quote the following sections of the statute deemed pertinent to the decision of the first question:

[Sec. 42-1801, I. C. A.]. "COOPERATION WITH GOVERNMENT UNDER ACT OF AUGUST 11, 1916.—The board of directors of any irrigation district organized under the laws of this state may make such investigations and based thereon, such representations and assurances to the secretary of the interior as may be requisite under the Act of Congress of August 11, 1916, entitled, 'An Act to Promote Reclamation of Arid Lands,' 39 U. S. St. L., ch. 319, p. 506."

[Sec. 42-1803, I. C. A.]. "CONTRACTS WITH FEDERAL GOVERNMENT UNDER RECLAMATION ACT.—The board of directors of an irrigation district organized under the laws of the state of Idaho may enter into any obligation or contract with the United States for the construction, operation and maintenance of the necessary works for the delivery and distribution of water therefrom under the provisions of the federal reclamation act and all acts amendatory thereof or supplementary thereto and the rules and regulations established thereunder; or the board may contract with the United States for a water supply under any act of Congress providing for or permitting such contract."

[Sec. 42-1804, I. C. A.]. "GENERAL POWERS OF BOARD CONTRACTING WITH GOVERNMENT.—The said board shall have full power to do any and all things required by the federal statutes now or hereafter enacted in connection with such contracts, and all things required by the rules and regulations now or that may hereafter be established by any department of the federal government in regard thereto; and in the purchase of any property or property rights, or in acquiring or contracting for the water supply of the district, the bonds of the district may be used by the board at not less than ninety per cent of their par value, in payment."

Notwithstanding the fact the legislature, by the enactment of the above-quoted sections, vested in Irrigation Districts full and complete power to "enter into any obligation or contract with the United States for the construction, operation, and maintenance of the necessary works for the delivery and distribution of water," and "for a water supply," and to that end "to do any and all things required by the Federal Statutes now or hereafter enacted in connection with such contracts, and all things required by the rules and regulations now or that may hereafter

be established by any department of the Federal Government in regard thereto," appellants contend the contract in question is ultra vires and void in that it delegates full power to the Board of Control and takes the management of the irrigation system and the distribution of water out of the hands of the District and places the same in such Board of Control, contrary to the provisions of Section 42-304, I. C. A., and that "any act done in excess of the powers granted by this statute is void," citing *Colburn v. Wilson*, 23 Ida. 337, 130 P. 381; In re King Hill Irrigation District, 37 Ida. 89, 221 P. 839; *Yaden v. Gem. Irr. Dist.*, 37 Ida. 300, 216 P. 250.

Sec. 42-304, supra, does not support appellants' contention. While that section provides "said board shall have the power to manage and conduct the business and affairs of the district," it further provides "the board of directors of an irrigation district organized under the laws of the state of Idaho *may enter into contracts for a water supply* to be delivered to the canals and works of the district, *and do any and every lawful act necessary to be done* that sufficient water may be furnished to the lands in the District for irrigation purposes." [Emphasis ours.] It will be observed the board is expressly authorized to contract "for a water supply" and to "do any and every lawful act necessary to be done that sufficient water may be furnished to the lands in the district for irrigation purposes." Hence, instead of acting in excess of the powers granted by Sec. 42-304, supra, the Board, by entering into the contract, discharged one of the most important duties imposed upon it by that section. To give the provision of the section vesting in the board "the power to manage and conduct the business and affairs of the district", the construction contended for by appellants would have the effect of making it most difficult, if not impossible, for the Board to contract for a water supply and thus furnish water for the irrigation of the lands within the district, without which the existence of the district would be worse than useless.

Nor do the cases cited support appellants' contention. In *Colburn v. Wilson*, supra, it appears the district *owned* a dam and reservoir and a certain part of a main canal which supplied water to its landowners and that it entered into a contract under the terms of which the management and control of the system were taken out of the hands of the District Board and placed in the hands of strangers.

This court, of course, held the contract was ultra vires and void. The Colburn case is not in point here in that the District in the case at bar, never owned, and does not now own, and will not own the property covered by the 1926 executory contract in question here until the district performs the terms and conditions of such contract to be done and performed by it. Furthermore, the property covered by that contract has never been in the possession nor under the control of the respondent district, as in the Colburn case. Therefore, never having had possession, control or management of the property covered by such contract, other than jointly through the Board of Control complained of by appellants, it follows the possession, control and management could not be [and an examination of the contract discloses the property is not] taken out of the hands of the District Board and placed in the hands of the Board of Control.

The King Hill Irrigation District case, supra, involved the question of the power of that district to levy a valid assessment of benefits growing out of a contract between that District and the United States for the reconstruction, repair and improvement of an irrigation system designed to irrigate the lands upon which the assessment of benefits was levied, it being contended the district could not levy such an assessment without first having acquired the ownership of the canal system. The question now under discussion was not involved in the King Hill Irrigation District case.

*Yaden v. Gem Irr. Dist.*, supra, was a proceeding in mandamus against the district to compel it to deliver surplus water for the irrigation of land lying outside the district. It was contended by Yaden, appellant in that proceeding, "that the water having once been applied to irrigate land and used for agricultural purposes, it was such a dedication and distribution of waters to a beneficial use she could not thereafter be deprived of." In the course of the discussion of that contention this court said that "an irrigation district acquiring a system which had theretofore furnished water to settlers outside of the district who had a vested right thereto is compelled to continue to deliver such water. But an irrigation district acquiring a system which only furnishes water to settlers within the district cannot be compelled thereafter to furnish water to settlers outside of the district. Irrigation districts are

creatures of the statutes. They are quasi-public or municipal corporations, and as such have only such power as is given to them by statute, or such as is necessarily implied" [citing cases], and that "the power of the directors or other officers of an Irrigation District is limited and any act done in excess of the express or implied provisions of the statute by such directors or other officers is ultra vires", to which, of course, we adhere. In the case at bar, however, instead of the Board of Directors or other officers of the respondent district either doing or attempting to do anything whatever in excess of either the express or implied provisions of the statute, the Board did only what the statute expressly authorizes it to do.

We come now to the consideration of the second question. Has the respondent District power to enter into a contract with the United States whereby the United States may, at some future time, substitute an equal amount of Payette and Salmon River water for District Boise River water?

The right to substitute waters of one stream for those of another was presented to this court in *Agnes B. Reno et al., v. J. R. Richards, et al.*, 32 Ida. 1, 178 P. 81. In that case it appears Birch Creek "has its source in Lemhi County, near the southern boundary"; that "it flows in a southeasterly direction for a distance of about thirty miles, its waters gradually sinking into the ground along the lower part of its course until they are all absorbed at a point commonly known as Birch Creek Sink, and they do not appear again at any known place"; that "Pass Creek has its source in a number of springs, and after flowing a distance of about six miles through a canyon, continues a distance of about three and one-half miles through a comparatively level country to a point where it empties into Birch Creek; that the soil through which it flows is very porous; that many obstructions were in the stream, and that there was a large percentage of loss by seepage and evaporation in its natural channel"; that Frank and Jessie Worthing "by removing obstructions from the channel, such as brush and fallen logs, and excavating channels through sand-bars and other obstructions, for a distance of some miles through the canyon, and by taking out a ditch of sufficient capacity to carry all the waters of the creek the remaining distance of three or four miles, they have considerably augmented the flow of the stream"; that the

Worthings, having increased the flow of the waters of Pass Creek [which flows on down and empties into Birch Creek] by about two second feet, claimed the right to take that amount of water from Birch Creek for the irrigation of their lands located above the point of the junction of those streams; that there were no intervening rights between those points; that there had been a "prior adjudication of the rights to the use of the waters of this stream [Birch Creek]." It thus appears in the Reno case the waters of Birch Creek had been decreed some 24 years before, and, therefore, that the waters of that stream had become appurtenant to the lands for the irrigation of which they had been decreed, just as it is contended by appellants the waters of Boise River have been decreed and become appurtenant to the lands of appellants' and, of course, other landowners in the respondent district. With substantially the same question presented as appellants contend is presented in the case at bar, this court, in the Reno case, held that "in the absence of detriment to other users of waters from Birch Creek, there is no doubt of their [the Worthings'] right to make a diversion from Birch Creek, at their point of diversion, of the amount of [increased] water which they caused to flow therein for the use of other appropriators farther down the stream."

It follows from this holding the fact water has been decreed for the irrigation of lands and become appurtenant thereto does not, for that reason alone, as contended by appellants, prevent a substitution; and, further, that a decree and the appurtenancy of water to lands do not, in and of themselves, constitute a sufficient reason for denying a substitution or exchange of water.

But appellants insist *Daniels v. Adair*, 38 Ida. 130, 220 P. 107, supports their contention. It appears in August, 1923, Margaret Mahaffey and the Pioneer Bank & Trust Company filed a complaint in the District Court for Lemhi County, by which they sought, among other things, a decree awarding them the right to use 175 inches of the waters of Agency Creek for the irrigation of their lands; that in 1914, a ditch, known as the Lemhi River Ditch, was constructed for the purpose of delivering water from the Lemhi River to Agency Creek *and to supply intervening users;* that Mahaffey and the bank sought, by delivering a certain amount of water from the river into the Lemhi Ditch, to have an equal amount of water delivered to them out of

Agency Creek in exchange therefor; that Daniels, the water-master of Agency Creek, refused to deliver any of the waters of Agency Creek to Mahaffey and the bank; that in December, 1914, Fred B. Pattee and Joseph L. Pattee and others, by decree, had been awarded all of the waters of Agency Creek; that Mahaffey and the bank sought to compel the Pattees to accept undecreed Lemhi River water *at a point below their* (the Pattees) *point of diversion* on Agency Creek, just as long as Mahaffey and the bank delivered 175 inches of the waters of Lemhi River into Agency Creek through and by means of the said Lemhi Ditch.

Upon the filing of the above-mentioned complaint by Mahaffey and the bank, on motion, an injunction issued enjoining the Pattees and Daniels, the water-master, from in any manner interfering with the alleged right of Mahaffey and the bank to use the said 175 inches of water so long as said amount of water was being supplied to the waters of Agency Creek from the Lemhi River through the Lemhi River Ditch, and requiring Daniels, the water-master, to deliver said water to Mahaffey and the bank. Following the issuance of the injunction, the Pattees and the water-master were cited for contempt for failing and refusing to comply with the injunction. Thereafter, a motion was made to dissolve the injunction. The motion being denied, the Pattees and Daniels, the water-master, prosecuted an original proceeding in this court (*Daniels v. Adair,* supra), to secure a permanent writ of prohibition enjoining Honorable Ralph W. Adair, then Judge of the District Court of the Sixth Judicial District, from taking any further action in said contempt proceeding.

It will be noted Mahaffey and the Bank sought to compel the Pattees to accept *below* their point of diversion the water which had theretofore been decreed to them, *and also that there were intervening rights.* To compel the Pattees to accept their decreed water *below* their point of diversion would, of course, *work an injury to the Pattees as well as to intervening water users.* This Court quoted that part of the opinion in *Reno v. Richards,* supra, wherein it was held an exchange of water would be permitted "in the absence of detriment to other users of water" and intervening rights, and again held, in harmony with the Reno case, that "under no circumstances can it be done [referring to the proposed exchange of water] where the exchange would result to

the detriment of prior users." It appearing the exchange of water sought by Mahaffey and the bank "would result to the detriment" of the Pattees, and also that there were intervening water rights, this Court very properly and correctly, under the above-stated facts, ordered the issuance of a permanent writ of prohibition enjoining further action in the contempt proceedings. Furthermore, *Daniels v. Adair,* supra, was an original proceeding brought in this court to secure a permanent writ of prohibition enjoining Judge Adair from proceeding further in the matter of punishing Daniels and the Pattees for contempt because of their failure to comply with the injunction issued by Judge Adair in the case of Mahaffey and the Pioneer Bank and Trust Company against the Pattees commenced in the District Court as above pointed out. This court could not, it must be conceded, pass upon water rights in an original proceeding brought in this court to secure a permanent writ of prohibition; hence, and as above stated, *Daniels v. Adair,* supra, does not support appellants' contention. Finally, it will be further noted the question involved in the case at bar: Has an irrigation district power to enter into a contract with the United States whereby the United States may, at some future time, substitute an equal amount of Payette and Salmon River water for district Boise River water? was not involved in *Daniels v. Adair,* supra.

It must be kept in mind the contest in the case at bar is between appellant landowners within respondent district and the district itself; that the sole purpose of the contract in question is to provide much-needed additional water for the irrigation of the irrigated lands within the boundaries of the district, including appellants' lands, in the manner and as expressly authorized by statute; that the additional supply of water contracted for from Anderson Ranch Reservoir does not depend upon a possible later substitution of water; that such additional supply is assured in any event; that the proposed contract will not have the effect of reducing the amount of water to which any landowner within the district is entitled; that no landowner is compelled to surrender any right whatsoever; that in the event an exchange of water is later made, such water would be emptied into the Boise River at a point above the diversion works of the respondent district; that in the event an exchange of water takes place as provided in the contract under consideration, then and in that case, a landowner

within the district, for instance, instead of receiving as at present, under the 1926 contract, 100 inches of the waters of Boise River, would receive a like amount of the waters of Payette and Salmon Rivers, and that such landowner would also receive his share of the Anderson Ranch Reservoir storage water contracted for, which would not, under the circumstances above stated, operate to the detriment of any landowner.

In *Nampa & Meridian Irr. Dist. v. Jas. G. Petrie et al.*, 28 Ida. 227, 238, 153 Pac. 425, a case which also involved the confirmation of a contract between an irrigation district and the United States "to secure supplemental storage water for the purpose of furnishing an adequate supply of water to properly irrigate lands within said district," this court pointed out that:

"The dominant purpose of our irrigation district law is to facilitate the economical and permanent reclamation of our arid lands, and it must be the constant aim of judicial construction to effectuate that purpose so far as consistent with the whole body of our law. The continued existence of an irrigation district depends upon its ability to furnish water to land owners within the district. * * * In the absence of * * * the right to furnish an adequate water supply * * *, the very purpose and object of the district would be thwarted and the growth and development of the state retarded to its serious detriment."

We conclude the judgment must be affirmed, and it is so ordered, with costs to respondent.

AILSHIE, J., (Concurring).—I do not understand or construe Sec. 43 of the contract as changing or attempting to change any priorities of locators or appropriators of water involved in these contracts; nor does it appear to authorize or contemplate any change or diversion to the detriment of appropriators or the amount of water to be received. The authority, which the district appears to confer upon the Reclamation Department, is this: At his option, "the Secretary shall have the right to substitute an equal amount of water from the Payette River or the Salmon River or in part from the Payette or in part from the Salmon . . . and make by appropriate credit such readjustment, if any, in the charges against the district he shall then find to be equitable in view of the changed conditions and applicable to the water supply furnished

for the district, but . . . shall not increase the financial obligation of the district."

It is too well settled to require citation of authority, that neither the district, the state, nor the United States can take an existing vested water right without payment of just compensation therefor. The water belongs to the state of Idaho. (Vol. II, Proc. Idaho Const. Convention, p. 1168 et seq.; Sec. 41-101, I. C. A.; Const., Secs. 4 and 5, Art. 15; *Walbridge v. Robinson*, 22 Ida. 236, 125 P. 812 (43 L. R. A., N. S., 240) ; *Twin Falls Salmon R. L. & W. Co. v. Caldwell*, 242 Fed. 177; and the right of the state to regulate and control the use, by appropriate procedural and administrative rules and regulations, is equally well settled. An appropriation or rental use gives the appropriator or user no title to the water; his right thus acquired is to the *use* only. *Coulson v. Aberdeen-Springfield Canal Co.*, 39 Ida. 320, 324, 227 P. 29.

When the United States acts through the agency of the Secretary of the Interior and under sanction of act of Congress, it does so in a purely *proprietary capacity* and is subject to the same rules and regulations regarding vested property rights as an individual.

We must assume that the contract under consideration was made in the light of the constitution of the state of Idaho (Secs. 4 and 5, Art. 15) and the state statutes, as well as the act of Congress authorizing these public works. Conferring on the secretary the right to substitute the waters of one stream for those of another, when that can be done without impairment of the rights of prior appropriators along these streams, is merely an administrative regulation calculated to be beneficial rather than detrimental to the proprietary rights of the water user. It can make no difference to the appropriator of water, whether he gets the water from one stream or another, or from the pooled waters of a lake or reservoir, so long as it is delivered to him at his headgate at the times and under the priorities to which his location and appropriation entitle him. This is equally true whether he be himself an original *locator, appropriator,* and *diverter of the waters,* (Sec. 3, Art. XV, Const.) or whether he has made *settlement and improvement, with a view to receiving water under a "sale, rental or distribution,"* (italics supplied) as contemplated by Sec. 5, Art. 15 of the Constitution. (See *Mellen v. Great Western Beet Sugar Co. et. al.,* 21 Ida. 353, 122 P. 30,

Ann. Cas. 1913D, 621; *Walbridge v. Robinson,* supra; *Nampa & Meridian Irr. Dist. v. Barclay,* 56 Ida. 13, 19, 47 P. (2d) 916, 100 A. L. R. 557.)

As I understand the contract here involved, it is proposed that the Federal Reclamation Department may, in the discretion of the secretary, construct diverting works to divert the waters of one stream or other source into another stream and impound them, and thereafter distribute the pooled water supply to the several water users in the amount and order of their respective appropriations and priorities from the several streams; and that the department is given such power under this contract. The contract is intended to preserve and protect the rights of the locators and appropriators of water rather than to impair them.

This view was apparently entertained when the original contract of April 6, 1926, was entered into; and we find paragraph 78 thereof providing as follows:

### "Water Rights Unchanged.

"78. It is agreed and understood that the water rights to which the project lands are now entitled remain unchanged hereunder, and under this contract the said project lands will be entitled to the same water rights to which they would be entitled under all existing contracts and water right appropriations applicable thereto, if this contract were not made."

Entertaining this view of the contract, I am concurring in the conclusion reached by the Chief Justice; and I want it specifically understood, that I am doing so, on the theory. and my understanding of the contract as herein set forth.

BUDGE, J. (Concurring specially.)

"This is a special proceeding, instituted by the filing of a petition of the Board of Directors of the Wilder Irrigation District under Sections 42-406, 42-407, and 42-408 of the Idaho Code, Annotated * * *, to have examined, approved and confirmed by the court, in accordance with the prayer of the petition, the proceedings taken by the said Board of Directors for its authorization of the execution of the contract between the United States of America and the Wilder Irrigation District, approved by the Secretary of the Interior January 13, 1941."

The trial court approved and confirmed the contract and duly entered its judgment from which this appeal is prose-

cuted. There are but two questions here for determination, namely:

"(a) Does the Wilder Irrigation District and its Board of Directors have the power and authority to enter into the contract sought to be confirmed in this action, in so far as the same relates to the Board of Control as referred to in said proposed contract?"

Upon this point I concur with Mr. Justice Givens.

"(b) Has the Wilder Irrigation District, or the Board of Directors thereof, the power or authority to enter into the proposed contract in so far as the same provides by paragraph 43 thereof for the right to substitute, at some future time, waters to be diverted from the Payette River or from the Salmon River into the Boise River above the Diversion Dam, as provided for in said contract?"

The contract was duly submitted to the landowners and waterusers within the Wilder Irrigation District at an election, duly called and held for the express purpose of submitting to said landowners and waterusers the question of whether the contract should be accepted or rejected. 806 votes were cast at said election; 657 votes were in favor of acceptance of the contract, and 149 votes were against such acceptance. Upon confirmation of the proceedings by the court, approval and acceptance of the contract by the Board of Directors, the Board of Directors of the Wilder Irrigation District was authorized to enter into the contract under the provisions of Sec. 42-304, I. C. A.:

"The Board of Directors of an irrigation district organized under the laws of the state of Idaho may * * * do any and every lawful act necessary to be done that sufficient water may be furnished to the lands in the district for irrigation purposes."

Appellants do not question the necessity for the district to acquire a supplemental water supply to properly irrigate the lands within the district. The landowners and waterusers, under the terms of the contract, will not be deprived of their water rights or priorities. There is a mere substitution or exchange of water, which right of substitution or exchange is authorized under the provisions of Sec. 41-105, I. C. A.:

"The water appropriated may be turned into the channel of another stream and mingled with its water, and then reclaimed; and water may be turned into any ditch, natural

channel or waterway from reservoirs or other sources of water supply, and such water may be *substituted* or *exchanged* for an equal amount of water diverted from the stream, creek or river into which such water flows, or any tributary thereof, but in reclaiming the water so mingled, or diverting water in lieu thereof from any such stream, creek, river or tributary, the amount of water to which prior appropriators may be entitled shall not be diminished, and due allowance shall be made for loss by evaporation and seepage." [Italics ours]

The source of the water supply is immaterial, under all the facts in this case, so long as the landowners and waterusers receive the quantity of water as of the date of their priorities for beneficial use. No additional burdens are to be placed upon the landowners and waterusers by reason of the exchange or substitution of water. It is the fixed and settled policy of the state to conserve and make available for beneficial use in the irrigation and reclamation of lands of the state all of the available waters within its boundaries, and to this end contracts have been entered into between duly organized irrigation districts and the Federal Government.

I agree with the conclusion reached by Mr. Justice Ailshie that the judgment should be affirmed. Costs awarded to respondents.

KOELSCH, D.J. (Concurring.)—I concur in the conclusion stated by Chief Justice Holden. But because of the importance of the questions involved, I am impelled to state the reasons for my concurrence.

A short review of the history of the participation of the United States in the reclamation of arid lands in the Boise Project will afford a convenient background from which to approach the issues here to be determined.

On June 17, 1902, the Congress of the United States enacted the Act generally referred to as the Reclamation Act. For a concise statement of the reasons, aims and objects of that Act, I quote from the case of *Swigart v. Baker*, 229 U. S. 187, 57 L. Ed. 1143:

"The official reports show that, in 1902, there were in sixteen states and territories 535,486,731 acres of public land still held by the government and subject to entry. A large part of this land was arid, and it was estimated that 35,000,000 acres could be profitably reclaimed by the

construction of irrigation works. The cost, however, was so stupendous as to make it impossible for the development to be undertaken by private enterprise; or, if so, only at the added expense of interest and profit private persons would naturally charge. With a view, therefore, of making these arid lands available for agricultural purposes by an expenditure of public money, it was proposed that the proceeds arising from the sale of all public lands in these sixteen states and territories should constitute a trust fund to be set aside for use in the construction of irrigation works—the cost of each project to be assessed against the land irrigated, and as fast as the money was paid by the owners back into the trust, it was again to be used for the construction of other works. Thus the fund, without diminution except for small and negligible sums not properly chargeable to any particular project, would be continually invested and reinvested in the reclamation of arid land. See H. R. Report No. 1468, 57th Congress, 1st session.

"The general outline of this plan was approved by Congress, which, on June 17, 1902 (32 Stat. at L. 389, Chap. 1093), passed 'An Act Appropriating the Receipts from the Sale and Disposal of Public Lands in Certain States and Territories to the Construction of Irrigation Works for the Reclamation of Arid Lands.'

"The statute provided that the money arising from the sales of the public lands in these states and territories was to be known as the reclamation fund, and was to be used for the purpose of reclaiming arid lands. Provision was made for preliminary surveys, and when the secretary determined that a project was practicable, he was authorized to make contracts for its construction, if there were funds available. The land capable of being irrigated was to be open only to homestead entry, and (Secs. 4-6) the secretary was then to give notice of the charges which should be made per acre and the number of instalments, not exceeding ten, in which the charges should be paid; these charges to be determined with a view of returning to the reclamation fund the estimated costs of the construction of the project, . . . and all money received from the above sources shall be paid into the reclamation fund . . ."

The Reclamation Act has been several times amended and acts supplemental thereto have been passed, some of which amendments and supplements will hereinafter be referred to.

At the outset it should be stated, and it should be borne in mind throughout the consideration of this case, that the embarkation by the Federal Government upon the enterprise of reclaiming some of the arid lands of the west was not done by virtue of its governmental functions, but solely in its proprietary powers, and in appropriating water and constructing dams and distributing systems, it has no greater power or superior rights under the law, than has an individual. (*Twin Falls Canal Co. v. Foote* (C. C. Ida. 1911) 192 Fed. 583; *Ickes v. Fox,* 85 Fed. (2d) 294.)

Indeed, the Reclamation Act itself provides that,

"Nothing in this chapter shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this chapter, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof." (Tit. 43, U. S. C. A., Sec. 383; *Burley v. U. S.,* 179 Fed. 1, 33 L. R. A. (N. S.) 807; *Pioneer Irr. Dist. v. Am. Ditch Ass'n.,* 50 Ida. 732, 1 P. (2d) 196.)

Among the projects undertaken by the government under authority of this Act is that commonly referred to as the Boise Project, in the course of the building of which the government constructed Arrow Rock dam, the Diversion dam, Deer Flat reservoir, and the distributing canals, including the completion of the New York Canal, which had theretofore been partially constructed by private initiative and capital. The Reclamation Act gives to the United States by and through its Secretary of the Interior the same, but no superior, right to appropriate the public unappropriated waters of the State of Idaho as the laws of this state give to the individual. (Sec. 372 and Sec. 383, Tit. 43, U. S. C. A.; *U. S. v. West Side Irr. Co.,* 230 Fed. 284.)

The Secretary of the Interior, having upon the initiation of the project and under authority granted him by the Reclamation Act (Sec. 3, now Sec. 416, Tit. 43, U. S. C. A.), withdrawn from entry the public lands proposed to be irrigated, and having thereafter given notice of their reopening for entry under the limitations of the Reclama-

tion Act, thereafter entered into contracts with entrymen of such lands, for the sale of water rights, the aggregate consideration for which, plus annual assessments for operation and maintenance expenses, was to repay the construction, operation and maintenance charges and costs, and to be paid in annual instalments.

Some of the lands supplied with water from the government works were embraced within irrigation districts even before the Boise Project was initiated. Large parts of the remaining lands under the project were thereafter included in irrigation districts, so that by 1926 there existed four such districts in the state of Idaho, namely, the New York Irrigation District, the Boise-Kuna Irrigation District, the Wilder Irrigation District, and the Nampa-Meridian Irrigation District, together with the Big Bend Irrigation District in the state of Oregon.

As already stated, the New York Canal had been partially constructed by private capital, and at the time I am writing about, the New York Canal Company, a corporation, was using part of it, and furnishing water through it to lands reclaimed by settlers thereon. This company, however, under the contracts hereinafter mentioned, transferred all of its rights and obligations to the New York Irrigation District and to the Boise-Kuna District. There are, however, still other lands not in any irrigation district which receive water from the Boise Project. With a small exception, not pertinent to this case, these lands remain in the same status as regards liability for construction and operation charges, as they were before the making of the said contracts and the transfer of the said works.

More than two-thirds of the lands comprised in these several districts were covered by water right contracts with the United States, so that, under the statute enacted by the Congress of the United States in 1924, commonly known as the Fact Finders Act (32 Stat. 702), and particularly under subdivisions G and I of Sec. 4 thereof (now Secs. 500, 501, Tit. 43, U. S. C. A.), and under the statutes of this state authorizing irrigation districts of this state to cooperate with the Federal Government (Tit. 42, Chap. 18, I. C. A.), the United States, in 1926, entered into contracts with each of the above mentioned districts, under which the government turned the operation, care and maintenance of the works in the Boise Project from a point about one-half mile below Diversion dam, over to the said irrigation

districts, reserving title to such transferred works in the United States, and reserving also, not only the title, but also the maintenance, operation and care of Arrow Rock dam, Diversion dam, and all parts of said works above the said point one-half mile below Diversion dam, in the United States.

On the other hand, the said districts assumed and agreed to pay the unpaid instalments of the individual landowners, many of which instalments were delinquent, and to pay the necessary annual operation and maintenance charges, including maintenance and operation costs of the reserved part of the system. The individual landowners were released from their obligations to the United States, and their delinquent instalments, including construction, maintenance, and operation charges were levied and assessed against their respective lands in accordance with the benefits thereto, which assessments thereupon became payable to the irrigation district in which the lands are situate, and by the latter to the United States. The advantage of this transfer, and undoubtedly the actuating purpose, was to turn over to the users of water, the control of the entire system (with the exception hereinbefore stated) by and through officers and agents of their own choosing. Accordingly, the law provides that the consent of such land-owners or water users, to the entering into of such a contract by the irrigation district, has to be obtained at an election held for that purpose (Sec. 42-1808, I. C. A.)

The contracts thus entered into by and between the several irrigation districts and the United States contain the following provisions:

"37. For the purpose of giving each of the several districts receiving water through the main canal of the Arrow Rock Division of the Boise Project fair representation on the board operating said canal, a Board of Control is hereby established which shall be the operating agent of the District and also the operating agent of the other districts receiving water from said main canal which shall contract with the United States to participate in the care, operation, and maintenance of the works to be transferred hereunder, such districts being hereinafter referred to as the other contracting organizations.

"38. The said Board of Control is hereby adopted by the district as its operating agent for the purpose of caring for, operating and maintaining the said main canal and

other works, the operation of which is hereby agreed to be transferred, and likewise shall be adopted as its operating agent by each of the organizations contracting with the United States to participate in the operation and maintenance of said main canal and other transferred works."

The contracts also specify the powers of the Board of Control shall have, specifically,

"all the powers with reference to the operation, maintenance, and control of said transferred works and delivery of water therefrom which could be exercised by the Board of Directors of the (several) districts, with reference to the operation, maintenance, and control of irrigation works and the delivery of water therefrom, including the powers applicable under state and federal laws to districts contracting with the United States." (Sec. 42, p. 49 of contract.)

In the exercise of the powers granted to the Board of Control, it is the common agent of the several districts in the project with, so far as I have been able to ascertain, one exception. I have hereinbefore pointed out that there are lands receiving water from the transferred works, which lands are not embraced within any irrigation district. As to such lands, Sec. 56 of the contract provides that,

"the collection of the construction and operation and maintenance charges shall be made by the Board of Control *as Fiscal Agent for the United States* and paid over to the United States promptly after such collection."

A careful study of the contract convinces me that the creation of the Board of Control is merely a device for the unified operation of the system—nothing more. The parties in interest still are the several districts, as are the landowners, when not included in any district, and the government looks to them for the carrying out of their obligations under the contract.

The contract so entered into by and between the respondent Wilder Irrigation District and the United States, is dated April 6, 1926, and a copy thereof marked "Exhibit B" is attached to and made a part of the answer and cross-complaint of the appellants herein. Similar contracts were entered into by the other districts in the Boise Project, and the system has ever since been operated thereunder.

The primary purpose of the creation of the Boise Proj-

ect, and the consequent construction of the Arrow Rock dam, was, of course, the storage of the high or flood waters of the Boise River watershed during the winter and spring run-off, so as to make them available for irrigation during the summer or low water season following. However, probably because of the cycle of years of extraordinary shortage of rain and snowfall through which this western part of the United States passed since the construction of the Arrow Rock dam, the storage of water by that dam impounded was, in some years, found inadequate to properly irrigate the lands served thereby. To alleviate this condition, the Secretary of the Interior, at the request of the waterusers under the Arrow Rock Division of the Boise Project, and after the proper investigation and surveys, commenced the construction of what is known as the Anderson Ranch dam on the South Fork of the Boise River. Prior to the commencement of such construction, a contract, similar in form with the contract of April 6, 1926, hereinbefore referred to, was submitted to the several Irrigation Districts, and the landowners not in irrigation districts, referred to in the early part of this opinion, for their approval and execution. The Board of Directors of the Wilder Irrigation District, on February 4, 1941, approved such contract, called and held an election by the electors of that district, on April 7, 1941, at which election the voters authorized the board to enter into the said contract. Thereafter, on May 6, 1941, the board, in accordance with the provisions of Chap. 18, Tit. 42, I. C. A., filed their petition in the District Court of the Seventh Judicial District, praying for confirmation of the proceedings had and taken. The petition came regularly on for hearing on July 29, 1941, at which time the appellants herein appeared and filed their answer and cross-complaint, objecting to the confirmation of said proceedings, and praying that the title to waters by them acquired and owned and in their cross-complaint described, be quieted as against the alleged claims and demands by the petitioners made thereon under paragraph 43 of the proposed contract.

On the 22nd day of August, 1941, the District Court made and entered its decree, confirming and approving all of the proceedings had, and declaring the proposed contract regular, valid and legal. It is from this decree that the appellants have taken their appeal to this court.

The proposed contract involved in this appeal is, as

stated, in many respects similar in form with the contract of April 6, 1926, refers to it and adopts certain of its provisions, as well as making available the distributive works of the Arrow Rock Division for the distribution of the waters to be stored in the Anderson Ranch Reservoir, and provides for the alternate use of the two dams for the storage of water properly allotted to either; and, in short, makes the two dams and reservoirs units of the same system. Of the provisions of the contract of April 6, 1926, thus adopted, recognized, and made part of the proposed contract, are those creating the Board of Control and prescribing its powers and duties.

It is this incorporation into the proposed contract that constitutes one of the two contentions made by the appellants against the validity of the contract. It is argued that these provisions of the contracts, in effect, provide for a delegation by the Board of Directors of the several irrigation districts, of duties imposed upon them by the law. This contention is without merit. A perusal of the two contracts shows that they do not take any power away from the districts, nor grant any powers to the Board of Control, inimical to those possessed by the districts. Both contracts specifically provide that the districts levy all assessments, make all collections, in fact, have and retain all administrative powers that the law enjoins upon them. With one or two exceptions not pertinent here, the Board of Control is strictly and legally the common agent of the several districts in the project, on the one hand, and the federal government on the other, and its duties and powers are confined to the operation, control and maintenance of of the transferred works constructed by the government, and to so operate, control and maintain said works under the direction of their said respective principals.

It must be remembered that the works thus transferred are not the property of the Irrigation Districts; they are, and until paid for, remain the property of the United States. That fact alone differentiates this case from the case of *Coburn v. Wilson*, 23 Ida. 337, 130 P. 381, cited by appellants. The contract condemned in that case is not set forth in the court's opinion, but enough is said to show that it was an attempt by the Board of Directors to give to others the management of an integral part of the irrigation system of the district. "A contract," says the court, "entered into by the Board of Directors of an irrigation district,

giving to a stranger the management and control of the reservoir, dam and main canal, and taking the management and control out of the district, would be ultra vires and void."

The Anderson Ranch Dam, when completed, will be merely an addition to the Arrow Rock Division of the Boise Project, and the adoption by the proposed contract of the Board of Control created by the former contract is merely to continue unified control and operation of the system constructed by the government.

A more serious objection to the validity of the proposed contract is made by the appellants by reason of the presence in that contract of Sec. 43, which reads as follows:

"It is agreed that in lieu of the water which the district is entitled to receive from the Boise River and its tributaries and the reservoirs thereon, or any part of such water, the United States, at the option of the secretary, shall have the right to substitute an equal amount of water from the Payette River or the Salmon River, or in part from the Payette and in part from the Salmon, and in the event of such substitution the secretary, upon the completion of the necessary tunnels and other works to such extent as may be necessary to convey such Payette River or Salmon River water to the Boise River immediately above the government diversion dam, for the Arrowrock Division of the Boise Project, will make, by appropriate credits, such readjustment, if any, in the charges against the district as he shall then find to be equitable in view of the changed conditions then applicable to the water supply furnished for the district, but such readjustment, if any, shall not increase the financial obligations of the district under this contract nor reduce the amount of water which the district is entitled to receive under this contract."

It is a rule of interpretation that a contract must be construed in the light of the circumstances surrounding its making.

As hereinbefore stated, the primary purpose in the construction of the Arrow Rock Dam was to capture and store some of the seasonal flood waters of the Boise watershed that annually escaped and passed on into the sea, and to make them available during the season when the normal flow of the Boise River is low and inadequate. Experience has shown, however, that Arrow Rock Dam, though of

great benefit, is not quite adequate. There have been years when the storage waters in that reservoir were exhausted before the close of the irrigation season. To insure against a recurrence of such conditions, the government, at the request of the waterusers within the Boise Project, now proposes to construct another dam, and to create another reservoir, further up the Boise River, to capture and hold flood waters that still escape because of the lack of storage capacity of the Arrow Rock Reservoir.

Further, the experience of the past few years leaves some doubt whether waters gathered by the Boise River watershed may not again during some years in the future, be insufficient, even with the storage capacity of the new proposed Anderson Ranch Reservoir added to the capacity of the Arrow Rock Reservoir, to satisfy the needs of all of the lands within this project.

The government therefore contemplates that in order to insure an adequate supply of irrigation water at all times, it may be necessary, not only to build the Anderson Ranch Dam, but also to pierce the Sawtooth Mountains with a gigantic tunnel, and thereby tap the abundant, unappropriated waters of the Salmon and the Payette Rivers, and to add them to the waters of the Boise. It is this contingency of the future that is referred to in Sec. 43 of the proposed contract.

But it is contended that the granting of this power to the Secretary of the Interior to substitute other water for the water appropriated by the appellant waterusers and others similarly situated, is inimical to property rights of appellants and other appropriators of water out of the Boise River.

I do not construe the attacked section of the proposed contract as authorizing the Secretary of the Interior at any time to modify or in any way to affect the water rights appurtenant to any of the lands in the Wilder Irrigation District. Their right to water appropriated out of the flow of the Boise River will continue to have its present date of priority, stipulated to be 1910. The basic law of water rights in this state, that first in time is first in right, creates a vested right, protected by the Constitution (Art. XV, Sec. 3) and by statute (Sec. 41-106, I. C. A.), and, as already hereinbefore pointed out, the Reclamation Act specifically enjoins upon the Secretary of the Interior in the carrying out of the purpose of that Act,

his duty of observing that law of our state. (Sec. 383, Tit. 43, U. S. C. A.)

The quoted paragraph of the proposed contract refers to water, not to water rights, a distinction which should be kept clearly in mind. Under the Constitution (Art. XV, Sec. 1), and under the statute (Sec. 41-101, I. C. A.), "All the waters of the state, when flowing in their natural channels * * * are declared to be the property of the state." (*Walbridge v. Robinson,* 22 Ida. 236, 125 P. 812, 43 L. R. A. (N. S.) 240; *Ickes v. Fox,* 85 Fed. (2d) 294.)

And it is only the right to the use thereof that can be acquired by appropriation. True, this right to the use of water is a property right of which the owner may not be deprived without his consent, or upon just compensation. Nevertheless, it does not comprehend the ownership of specific water; such ownership remains in the state. The appropriator's right consists merely in the right to the use of such portion of the waters of the state as he can and does put to beneficial use, and of a fixed priority with relation to other appropriators. Nor has it ever been demonstrated that there is any difference in the quality of any of the public waters of this state that affects their virtue for irrigation purposes. It can therefore give no ground for complaint if an appropriator's right is fulfilled by the delivery of water from a source other than that from which he made his appropriation. (*Adams v. Salt River Water Users Ass'n.* (Ariz.) 89 P. (2d) 1060 (1066).

But it is said that this is in contravention of *Daniels v. Adair,* 38 Ida. 130, 220 P. 107. In that case the Pattees, defendants, had a decreed right to waters out of Agency Creek. The plaintiffs, and others, subsequently constructed a ditch to conduct water from the Lemhi River into Agency Creek, joining the latter at a point below the diversion point of the defendants. Thereupon the plaintiffs sought to enjoin the defendants from using the water out of Agency Creek by virtue of their decreed right, and to compel them to use water turned into that creek through the Lemhi River ditch. This court, after adverting to the law which allows a change of point of diversion, and to the right permitting water turned into a stream to be taken out again at a lower point, says:

"In the instant case the plaintiffs do not seek relief upon this theory, but, on the contrary, seek to take decreed waters of petitioners, Pattees, diverted from Agency Creek

above the point where the Lemhi River ditch empties into Agency Creek, and compel petitioners to accept Lemhi River water at a point below their point of diversion just so long as plaintiffs deliver 175 inches of the waters of Lemhi River into Agency Creek. Under the facts as admitted in the pleadings the power to bring about such an exchange would be beyond and in excess of the jurisdiction of the court."

That the court intended to limit its decision to the peculiar facts of the case is further evidenced by its statement that,

"It may be that under certain circumstances, where a clear case is made, an exchange of water may be brought about, but under no circumstances can it be done where the exchange would result to the detriment of prior users or result in depriving such prior users of a property right."

Clearly, the facts in that case show an attempt to compel an exchange of water right. In the case at bar, no such exchange is involved or threatened. The government merely says, in effect, "If in our effort to secure a more adequate supply of water, and in the course of a fair and equitable distribution of such greater supply, it should become necessary to satisfy the rights of any of the appropriators or users in this project with water from a new source, we want the right to do so." These waterusers are not asked to surrender or even to modify their rights; the power to change the quantity of water to which they are entitled, and the relative dates of their rights to such quantity, is not by this contract committed to the Secretary of the Interior.

Thus construed, the contract is not only consonant with the beneficient aims and purposes of the Reclamation Act, but is not in contravention of either constitutional or statutory provisions. I therefore concur in affirming the decree of the District Court.

GIVENS, J. (Dissenting.)—Appellants, as members of respondent irrigation district, are the owners of water rights therein. While the record is not as specific as it might be, evidently their water rights were obtained either by them or their predecessors in interest originally from and under the United States Boise-Payette reclamation project established February 13, 1906, and appellants were consenting land owners to the contract, Exhibit "B", dated

April 6, 1926, attached to appellants' answer and cross-complaint. Prior to that time the lands now in the Wilder Irrigation District, so far as this controversy is concerned, were in the Boise-Payette reclamation project. The 1926 contract in effect contemplated and provided for the splitting of the Boise-Payette reclamation project into separate irrigation districts which should thereafter function as such, assuming responsibility for the payment of the costs of their share of the original reclamation project to the government, the government reserving and retaining title and certain rights over the otherwise transferred irrigation works consisting of the Arrow Rock Dam, canals, etc., until paid for. This contract also provided for a board of control, and the provisions relative thereto are substantially reiterated in Exhibit "A", the contract of January 13, 1941, now under question. Appellants or their predecessors in interest evidently not only consented to the 1926 contract, but also availed themselves of the benefits under that contract since its date. There is no substantial change in the classification of the personnel, formation, duties, or powers of the board of control in the two contracts, hence, as to the first question presented I concur in holding that the provisions in the present contract with regard to the board of control do not infringe or violate any constitutional right of appellants.

The second question, it seems to me, does not depend upon the right to change a point of diversion but depends upon the status of the water right of a member of an irrigation district, in the first place; and second, whether or not the majority members of an irrigation district can, without the consent of a minority non-consenting member, compel him to submit to a contract whereby the Secretary of the Interior can, without such member's consent, compel him to receive water not under the original filing and appropriation made by him of both natural flow and storage water out of the Boise River, but in lieu thereof accept substituted water, not yet filed upon, appropriated, nor diverted, and, so far as the geographical location of appellants' lands is concerned, from entirely separate and distinct watersheds, namely, the Payette River and/or the Salmon River.

While some courts have stated that a wateruser is not concerned with and has no right to any specific source of supply or to any particular water (*Adams v. Salt River Val-*

*ley Water Users' Ass'n,* 53 Ariz. 374, 89 P. (2d) 1060; *Nampa & Meridian Irr. Dist. v. Barclay,* 56 Ida. 13, 47 P. (2d) 916, 100 A. L. R. 557), an appropriator does have, after diversion and application to a beneficial use, a constitutional right to the continuation of the source of his supply of water as it physically existed at the time his appropriation was made. (*Arkoosh v. Big Wood Canal Co.,* 48 Ida. 383, 283 P. 522.) It is true no attempt has yet been made to make the change authorized in Exhibit "A"; the clause pertinent to this point, nevertheless, gives the Secretary of the Interior sole power to make such change when and as he may please.

"43. It is agreed that in lieu of the water which the district [is] entitled to receive from the Boise River and its tributaries and the reservoirs thereon, or any part of such water, the United States, at the option of the secretary, shall have the right to substitute an equal amount of water from the Payette River or the Salmon River, or in part from the Payette and in part from the Salmon, and in the event of such substitution the secretary, upon the completion of the necessary tunnels and other works to such extent as may be necessary to convey such Payette River or Salmon River water to the Boise River immediately above the government diversion dam, for the Arrowrock Division of the Boise Project, will make, by appropriate credits, such readjustment, if any, in the charges against the district as he shall then find to be equitable in view of the changed conditions then applicable to the water supply furnished for the district, but such readjustment, if any, shall not increase the financial obligations of the district under this contract nor reduce the amount of water which the district is entitled to receive under this contract."

This provision of the contract affects not only water to be hereafter furnished from Anderson Dam Reservoir, but gives the secretary the right to compel substitution of water for *appellants' existing water rights.*

If Salmon River or Payette River water is substituted for Boise River water to appellants, the water theretofore used by them and obtained from Boise River sources will necessarily have to be transferred to someone else, as without continued application to a beneficial use the appropriation thereof would lapse. If, after a period of time, under such substitution, the water from Payette or Salmon Rivers, due to physical conditions which might arise and over

which man would have no control, would fail, even though appellants' rights would be paramount to the interim users, appellants would at least face the probability of a lawsuit to determine such right, and, in the meantime, be subject to the possibility that they would have no water, and hence their lands would be worthless. Surely the minority owners and holders of water rights in an irrigation district by the application of water to a beneficial use acquire some rights under Art. 15, Sec. 4, Idaho constitution, which cannot be taken from them without their consent.

This provision in the contract is attempted to be glossed over by euphemistic characterization that it is a mere rule or regulation by the Secretary of the Interior for the operation of the irrigation works constructed by the United States government, whose control and operation is retained by it. The consequences affect vested, substantial rights, and it is not merely a matter of operation or regulation. As stated in the majority opinion, this provision of the contract has absolutely no connection with the supply of water from Anderson Ranch Dam. It is authorizing and accepting uncertainty for certainty. It seems to me, under the expressed theory and general nature of an irrigation district as enunciated by the following, this provision of the contract is in violation of Art. 15, Sec. 4, of the Idaho constitution.[1] (*Merchants' Nat. Bank of San Diego v. Escondido Irr. Dist.*, 144 Cal. 329, 77 P. 937; *Tulare Irrigation District v. Collins*, 154 Cal. 440, 97 P. 1124; *Hall v. Superior Court*, 198 Cal. 373, 245 P. 814; *Post v. Wright*, 37 Ariz. 105, 289 P. 979; *Lindsay-Strathmore Irr. Dist. v. Wutchumna Water Co.*, 111 Cal. App. 688, 296 P. 933; *Durand v. Middle Rio Grande Conservancy Dist.*, 46 N. M. 138, 123 P. (2d) 389; *Colburn v. Wilson*, 23 Ida. 337, 130 P. 381; *Lewiston Orchards Irr. Dist. v. Gilmore*, 53 Ida. 377, 23 P. (2d) 720.)

[1] "Sec. 4. Continuing rights to water guaranteed. Whenever any waters have been, or shall be, appropriated or used for agricultural purposes, under a sale, rental, or distribution thereof, such sale, rental, or distribution shall be deemed an exclusive dedication to such use; and whenever such waters so dedicated shall have once been sold, rented or distributed to any person who has settled upon or improved land for agricultural purposes with the view of receiving the benefit of such water under such dedication, such person, his heirs, executors, administrators, successors, or assigns, shall not thereafter, without his consent, be deprived of the annual use of the same, when needed

*Colburn v. Wilson,* supra; In re King Hill Irrigation District, 37 Ida. 89, 221 P. 839; and *Yaden v. Gem Irr. Dist.,* 37 Ida. 300, 216 P. 250, do not support respondent on the point that an irrigation district may thus force upon a nonconsenting minority member thereof substituted water from an entirely different watershed. In fact, it seems to me that *Daniels v. Adair,* 38 Ida. 130, at 135, 220 P. 107, in a carefully prepared and unanimous opinion, holds directly to the contrary.

"It would seem to us that plaintiffs are attempting, by invoking the injunctive power of the trial court, to enforce an exchange of the waters of Lemhi River for the waters of Agency Creek. It is admitted that the petitioners, Pattees, have a decreed right to the waters of Agency Creek. *To require them to surrender such property right and take in lieu thereof undecreed waters of Lemhi River would be in violation of their constitutional right to the possession and enjoyment of their property.*" [Emphasis mine.]

The most that any of the cases relied on by respondent hold is that an appropriator may turn his water into a stream and at a lower point take such water out, even though such is not the stream of original diversion, due allowance being made, of course, for the water of other parties in such stream and that there must be no diminution thereof. This is a far cry, as indicated in *Daniels v. Adair,* supra, from compelling a wateruser to take water from a different watershed.

It is strenuously urged that the transfer provided for in Sec. 43 of the contract immediately under consideration does not amount to a transfer of water rights but merely a substitution of water, and reliance is placed upon Sec. 41-105, I. C. A. The transfer, however, is authorized solely at the option of the Secretary of the Interior. And even if it be considered only a substitution of water, being solely at the option of the Secretary of the Interior, such contract goes so far beyond the provisions of 41-105, I .C. A., as to be in conflict with the underlined.portion of the provisions of Sec. 1, Art. 15 of the state constitution:

"Sec. 1.   Use of waters a public use.—The use of all

for domestic purposes, or to irrigate the land so settled upon or improved, upon payment.therefor, and compliance with such equitable terms and conditions as to the quantity used and times of use, as may be prescribed by law."

waters now appropriated, or that may hereafter be appropriated for sale, rental or distribution; also of all water originally appropriated for private use, but which after such appropriation has heretofore been, or may hereafter be sold, rented, or distributed, is hereby declared to be a public use, *and subject to the regulation and control of the state in the manner prescribed by law.*"

Also:

"41-101. Nature of property in water.—Water being essential to the industrial prosperity of the state, and all agricultural development throughout the greater portion of the state depending upon its just apportionment to, and economical use by, those making a beneficial application of the same, its control shall be in the state, which, in providing for its use, shall equally guard all the various interests involved. All the waters of the state, when flowing in their natural channels, including the waters of all natural springs and lakes within the boundaries of the state are declared to be the property of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same therefrom for any beneficial purpose, and the right to the use of any of the waters of the state for useful or beneficial purposes is recognized and confirmed; and the right to the use of any of the public waters which have heretofore been or may hereafter be allotted or beneficially applied, shall not be considered as being a property right in itself, but such right shall become the complement of, or one of the appurtenances of, the land or other thing to which, through necessity, said water is being applied; and the right to continue the use of any such water shall never be denied or prevented from any other cause than the failure on the part of the user thereof to pay the ordinary charges or assessments which may be made to cover the expenses for the delivery of such water."

And:

"41-502. Department of reclamation to supervise water distribution.—It shall be the duty of the department of reclamation to have immediate direction and control of the distribution of water from all of the streams to the canals and ditches diverting therefrom. The department must execute the laws relative to the distribution of water in accordance with rights of prior appropriation.

"The department of reclamation shall, in the distribution

of water from the streams to the canals, be governed by this title."

In other words, the contract in effect places the right to control the substitution of this water in the hands of the Secretary of the Interior and takes it out of the hands of the state department of reclamation and out of the control of the state. It will be noticed that nowhere in the contract does it provide that this substitution shall be in accordance with the state law or under the approval of the state department of reclamation. It may be contended that the law, nevertheless, is written into the contract. One of the parties to the contract, however, is the Secretary of the Interior, a federal officer. Without specific provision in the contract therefor, could the court later at the behest of a private individual assert that in effect the federal government had, without its express consent in the contract, been willing to be subservient to state law or the control or supervision of a state officer? Is not a contrary thought clearly expressed in the following?

"(b)  The elementary principle that, under the constitution, the authority of the government of the United States is paramount when exerted as to subjects concerning which it has the power to control, is indisputable. This being true, it results that although authority to regulate within a given sphere may exist in both the United States and in the states, when the former calls into play constitutional authority within such general sphere the necessary effect of doing so is, that to the extent that any conflict arises the state power is limited, since in case of conflict that which is paramount necessarily controls that which is subordinate." (*Northern P. R. Co. v. North Dakota ex rel. Langer*, 250 U. S. 135, 63 L. ed. 897, at 904.)

(*State of Missouri v. Holland*, 252 U. S. 416, 64 L. ed. 641; *Sanitary District of Chicago v. United States*, 266 U. S. 405, 69 L. ed. 352; *State of Florida v. Mellon*, 273 U. S. 12, 71 L. ed. 511, at 515.)

The pertinent point of these cases is that the Secretary of the Interior, being a federal officer, and certain powers either being granted him by the contract or certain rights otherwise possessed by waterusers under the state law being waived, if he later should assert his right to order the substitution of these waters in opposition to an order

made by the state department of reclamation in its attempted control of the waters of these streams under the state constitution and laws, the order of the Secretary of Interior would prevail. It may be argued that he would have this authority in the absence of the contract since appellant's right to use the water in question was first obtained through and by a United States reclamation project. That project, however, by appropriating the waters under the state law would seem to have recognized the right of the state to control the distribution thereof. Furthermore, appellants' water rights are now in an irrigation district organized under the state law. It would appear that one purpose of the contract is to make it perfectly plain that the Secretary of Interior is now securing rights which he did not heretofore possess with regard to the already appropriated waters owned by appellants, not those to be hereafter secured from the Anderson Dam Reservoir. Conceding the right of the United States must definitely appear, this contract would seem a step in that direction and no doubt designed for that purpose. (*Carey v. State of South Dakota,* 250 U. S. 118, 63 L. ed. 886, at 888.) "* * * whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear." (*State of Florida v. United States,* 282 U. S. 194, 75 L. ed. 291, at 302.) In other words, if applied herein, absent the contract, the power of the secretary to order the substitution might be doubtful, the contract would seem designed to clearly give him that authority as against state authority. The rights of state appropriators, if we may coin such a phrase, and which appellants now, as members of a state organized district, are, as against possible future federal government appropriators, precarious enough at best. (*Marsters v. United States,* 236 Fed. 663.) Should we add to the potential hazards of such appropriators?

If the Secretary of the Interior without this provision in the contract now has the right, power, and authority to order the substitution of water authorized by this provision in the contract, such provision is unnecessary. If he does not without such provision have such right, power, and authority, then either the appellants without their consent are compelled to give up some right which they now possess, or to acquiesce in some power, right, or authority being taken from the state commissioner of reclamation

and transferred to the Secretary of the Interior. In either event the provision in the contract should not be approved. I dissent from approving Sec. 43 of the contract.