501 P.2d 700

**ALMO WATER COMPANY, an Idaho
corporation, Plaintiff-Appellant,**

v.

**Ivan DARRINGTON, as Water Master of
Water District 8E, et al., Defend-
ants-Respondents.**

No. 10748.

Supreme Court of Idaho.

Sept. 25, 1972.

A. H. Nielson, of Nielson, Nielson & Nielson, Burley, John R. Coleman, of Parry, Robertson, Daly & Larson, Twin Falls, for plaintiff-appellant.

Lawrence H. Duffin, Burley, W. Anthony Park, Atty. Gen., Phillip M. Barber, Asst. Atty. Gen., Boise, for defendants-respondents.

McQUADE, Chief Justice.

The issues in this unusual water rights case require the application of law to complex facts, pieced together from a record that is a thicket of obscurities and apparent contradictions. The foundation of our analysis is a comprehensive statement of the facts as we perceive them.

I

Water District 8–E is located in an arid region of the state where farming and ranching depend on irrigation from mountain streams during the summer run-off. Rights to the water in Almo Creek and Edwards Creek, portrayed on the following map, were established in 1928 by a federal

district court in an unreported decision commonly known as the "Jobe Adams decree." [1] The decree provided that one Helen Edwards was entitled to 80 inches (1.6 second-feet) of water from the "North Fork" of Almo Creek [2] under an 1879 priority, supplemented by the right to divert water from Edwards Creek under the same priority if necessary to fill her 80 inches. The decree further established the rights of William and Mary Jones, with 1880 priorities, to 350 inches (7 second-feet) from the "North Fork" of Almo Creek and 350 inches from Edwards Creek. The latter right usually has consumed all the water remaining in Edwards Creek, with little or no water reaching the point of confluence with Almo Creek. The other rights decreed in the "North Fork" of Almo Creek are now held by respondents Glen and Doris Jones (60 inches, 1880) and respondents Arley and Edna Cahoon (60 inches, 1880).

The Helen Edwards right today is held by respondent Louis Eames, owner of the rectangular strip of land running east and west on the map. Respondents Owen and Norman Jones own the larger, irregularly shaped parcel south of Eames' property, and now hold the rights decreed to William and Mary Jones. The appellant, Almo Water Company, represents the interests of shareholders who also had rights decreed in Almo Creek, ranging in priority from 1878 to 1884. [3]

The "Jobe Adams decree" apparently did not conform to then existing methods employed to fill the Edwards and Jones water rights. It appears that Helen Edwards had drawn her 80 inches under 1879 priority primarily from Edwards Creek rather than from the "North Fork" of the Almo. In return, William and Mary Jones had diverted an extra 80 inches from the "North Fork," beyond the 1880 right to 350 inches eventually decreed. This practice was not changed in response to the "Jobe Adams decree;" in fact, it was continued by agreement between Louis Eames and Owen and Norma Jones when they succeeded to the Edwards and Jones rights, respectively. The district watermasters, bound by the duties of their office to distribute water in accord with the decree, [4] took no official notice of the agreement. However, they continued to channel 80 inches of water down the "North Fork" of Almo Creek pursuant to the Edwards right, even though it was there diverted by Owen and Norma Jones rather than by Louis Eames.

It appears that this water exchange benefited Eames by enabling him to irrigate a greater portion of his land than would have been possible with water from the "North Fork" of the Almo. The Joneses lost 80 inches from Edwards Creek, but the use of Eames' 80 inches in the "North Fork" afforded them the potential opportunity to fill part of their 1880 rights with water made available under an 1879 priority. This potential elevation of the Joneses' priority in the "North Fork" created a conflict with rights held by the Almo Water Company which were senior to the 1880 rights decreed to the Joneses but subordinate to the 1879 right actually exercised by agreement with Eames. If water in Almo Creek became scarce during dry periods, the agreement might have enabled the Joneses to receive water not available to the Company's shareholders.

This controversy simmered for years without erupting into litigation, apparently because the Eames-Jones agreement did not directly affect the actual quantity of water available to the shareholders. Ab-

---

1. A copy of the decree was not included in the record on appeal. Our discussion is based on portions of the decree quoted in the district court's memorandum decision.

2. The "North Fork" of Almo Creek is also known as the "North Almo" and "Taylor Ditch."

3. It appears that when the company was formed in 1906, shares were exchanged for conveyances of water rights. However, the "Jobe Adams decree" in 1928 still referred to the individuals involved, rather than to the company.

4. I.C. §§ 42–602, 42–607; Stethem v. Skinner, 11 Idaho 374, 82 P. 451 (1905).

sent the agreement, Eames rather than the Joneses could have drawn 80 inches from the "North Fork" of Almo Creek under his 1879 priority, pursuant to the "Jobe Adams decree."[5] In either event, 80 inches would be drawn from the "North Fork" under 1879 priority. The water exchange agreement created technical difficulty in accounting for delivery of water under the decree; but it did not, by itself, appear to infringe upon the substantial rights of the shareholders.

The catalyst of the present dispute apparently has been the physical fact that the "North Fork" of Almo Creek is nothing but a plowed ditch containing no water unless Almo Creek is turned from its natural course, called the "South Fork," at the diversion point indicated on the map. When water is not flowing in the "North Fork" the soil along the banks and bottom of the ditch becomes so dry that when water is turned in at the diversion point, some 300 inches are absorbed before 80 inches can reach the Eames or Jones properties. When the soil becomes saturated, within a few days, the water losses diminish. These initial losses are injurious to all users of water from Almo Creek. To minimize similar waste elsewhere in the system, the Almo Water Company has constructed a canal, shown on the map, to carry water more efficiently from the northern reaches of Almo Creek to its shareholders. However, the district watermaster must leave sufficient water in Almo Creek for diversion into the "North Fork" to fill the 1879 Eames right, the 1880 Jones right, and two other 1880 rights discussed earlier.

When water becomes scarce during the irrigation season, and the priorities among competing rights become critical, the interests of the shareholders clash with the interests of the "North Fork" water users. From the shareholders' point of view, the fewer the rights along the "North Fork," and the lower their priorities, the more Almo Creek water is available for distribution elsewhere in the Almo water system. Although it consists of only 80 inches, the 1879 Eames right significantly affects the shareholders' rights because it is the first "North Fork" right to be filled; consequently, it necessitates the 300 inch water loss incident to starting deliveries along the "North Fork." If this right were eliminated, the "North Fork" water loss could be avoided until the 1880 rights were filled, making more water available for distribution to the shareholder rights junior to the 1879 Eames right but senior to the remaining 1880 rights on the "North Fork."

In 1969 this controversy induced respondent Ivan Darrington, as district watermaster, to seek direction from respondent R. Keith Higginson, the State Reclamation Engineer, on how to distribute the waters of Almo Creek and Edwards Creek. Pursuant to instructions, Darrington attempted to comply with the "Jobe Adams decree" by filling the 1879 Eames right with "North Fork" water transferred to Edwards Creek through a connector channel shown on the map. The appellant, Almo Water Company, then brought this action to enjoin future deliveries to the 1879 Eames right from the "North Fork." The Company also sought a decree to the effect that the 1879 Eames right in the "North Fork" had been lost through abandonment, forfeiture, acquiescence, change of diversion point, or adverse possession, because Eames had drawn his water from Edwards Creek by agreement with the Joneses prior to 1969. Such a decree would have relagated Eames to an 1880 right on Edwards Creek and extinguished the 1879 right on the "North Fork," to the benefit of Almo Water Company shareholders. Instead, the district court essentially ordered a return to status quo. The decree directed the watermaster to fill the 1879 Eames right

---

5. The trial court found that no diversion facility existed in the "North Fork" to turn water on Eames' property. However, a ditch to carry the water ran to the bank of the "North Fork" from Eames' land, and could be made serviceable when cleaned.

from the "North Fork," "subject, however, to any water-exchange agreements made between the said Louis Eames and others." This appeal followed.

## II

The general issue framed by appellant's assignments of error is whether the water exchange caused Louis Eames to lose the decreed 1879 right on the "North Fork" of Almo Creek. This issue is complicated by a failure of the record clearly to indicate whether the district watermasters, during periods of scarcity, filled the 1879 right of 80 inches from the "North Fork" (used by the Joneses under the exchange agreement) *before* the 1880 rights were filled or at the *same time*. Several watermasters testified that they had treated the 80 inches as 1879 water, regardless of the exchange agreement, so that, presumably, this water was diverted into the "North Fork" even when the 1880 rights were not flowing.[6] In contrast, the operator of the Jones ranch testified that the 80 inches were delivered only when the 1880 rights also were being filled. The district court made no finding on this question.

The significance of this gap in the record is that if the 80 inches were delivered as 1879 water, the legal issue on appeal is whether a water exchange agreement can cause the loss of a water right by abandonment, forfeiture, acquiescence, change of diversion point, or adverse possession. If the 80 inches were delivered by the watermasters as though it were 1880 water, then the legal issue is whether the

failure of a watermaster, to deliver water subject to an exchange agreement in compliance with the decree priority, can cause the loss of a water right as indicated above. These alternative issues will be discussed in turn.

■ Water exchanges have been recognized in Idaho case law[7] and recently have been authorized expressly by statute.[8] Such exchanges are invalid only if they clearly infringe upon the rights of other water users.[9] The record in this case contains no showing by appellant that the exchange has diminished the quantity of water actually distributed to its shareholders. At most, the exchange agreement appears to have created an accounting problem for watermasters under the "Jobe Adams decree." Absent a showing of actual harm to the shareholders, appellant's challenge to the change of diversion points incident to the exchange is also without basis.[10] Similarly, Eames' acquiescence in the Joneses' use of the 1879 water does not estop him under the doctrine of laches, from asserting his 1879 right against the shareholders because it has not been shown that the shareholders relied on the agreement to their actual detriment.[11] Moreover, because the agreement has produced reciprocal permissive uses of the water, it negates the element of adversity required for rights to be lost by adverse possession or prescription.[12] The reciprocal permissive uses also protect the right in question from abandonment or forfeiture, because they vitiate the elements of intent to abandon

6. Public officers are presumed to have performed their official duties. *E. g.*, Adams County v. First Bank of Council, 47 Idaho 89, 272 P. 699 (1928) ; American Fruit Growers, Inc. v. Walmstad, 44 Idaho 786, 260 P. 168 (1927).

7. *E. g.*, Board of Directors of Wilder Irr. Dist. v. Jorgensen, 64 Idaho 538, 136 P. 2d 461 (1943) ; *see* Hutchins, Idaho Law of Water Rights, 5 Idaho L.Rev. 1, 60–61 (1968).

8. I.C. § 42–105 (as amended, 1969).

9. *See* Daniels v. Adair, 38 Idaho 130, 220 P. 107 (1923).

10. Holders of water rights may change their diversion points if others are not thereby injured. I.C. § 42–108. *E. g.*, Basinger v. Taylor, 30 Idaho 289, 164 P. 522 (1917) ; Bennett v. Nourse, 22 Idaho 249, 125 P. 1038 (1912).

11. *Compare* Mountain Home Irr. Dist. v. Duffy, 79 Idaho 435, 319 P.2d 965 (1957).

12. Frost v. Penfold, 44 Idaho 651, 258 P. 534 (1927) ; Hall v. Blackman, 8 Idaho 272, 68 P. 19 (1902).

and failure to put the appropriated water to beneficial use.[13] We conclude that the exchange agreement has not extinguished Eames' 1879 right to 80 inches of water from the "North Fork."

This conclusion would not be altered if the watermasters had treated the 1879 right as an 1880 right. Watermasters in properly constituted water districts exercise exclusive power under I.C. § 42–601 et seq., to distribute water among appropriators. The State has persuasively argued in its brief that the purpose of this broad grant of authority has been to insure that a water right consists of more than the mere right to a lawsuit against an interfering water user. By providing for controlled delivery of water, the statutory scheme protects and implements established water rights.

Because the watermaster is a ministerial officer, he is authorized to distribute water only in compliance with applicable decrees.[14] The holders of water rights are entitled to presume that the watermaster is delivering water to them in compliance with the priorities expressed in the governing decree.[15] Consequently, unless it be shown that the holder of the water right in question actually was aware that he was not receiving water from the watermaster in accord with his decreed right, that right could not be lost through estoppel because the element of "knowing" acquiescence is lacking.[16] The record in this case contains no such showing. Although the operator of the Jones ranch testified that the 1879 and 1880 waters were distributed concurrently, the record does not indicate that· Eames was aware of this or that it occurred when the watermasters were filling other 1879 rights to the exclusion of 1880 rights in the Almo water system. Neither would interference by the watermaster in the exercise of a decreed right, by failure to fill that right in accord with the decreed priority, establish grounds for abandonment or forfeiture where, as here, the water actually delivered was put to beneficial use, under the exchange agreement.[17] Finally, a water right would not be lost through adverse possession or prescription when the water was distributed by a duly appointed or elected watermaster during the period in question.[18] We conclude, as before, that the 1879 Eames right to 80 inches from the "North Fork" has not been extinguished.

The order and decree of the district court are affirmed. Costs to respondents.

McFADDEN, DONALDSON, SHEPARD, and BAKES, JJ., concur.

13. Zezi v. Lightfoot, 57 Idaho 707, 68 P. 2d 50 (1937); cf. Carrington v. Crandall, 65 Idaho 525, 147 P.2d 1009 (1944).

14. Nampa & Meridian Irr. Dist. v. Barclay, 56 Idaho 13, 47 P.2d 916 (1935); Bailey v. Idaho Irr. Co., Ltd., 39 Idaho 354, 227 P. 1055 (1924); Stethem v. Skinner, supra note 4.

15. See note 6, supra.

16. Compare Hillcrest Irr. Dist. v. Nampa & Meridian Irr. Dist., 57 Idaho 403, 66 P.2d 115 (1937).

17. Cf. Hodges v. Trail Creek Irr. Co., 78 Idaho 10, 297 P.2d 524 (1956); Welch v. Garrett, 5 Idaho 639, 51 P. 405 (1897); I.C. § 42–222(2). This case thus is distinguished from cases where water available to the holder of the water right is not applied to a beneficial use. E. g., Graham v. Leek, 65 Idaho 279, 144 P.2d 475 (1944).

18. Big Wood Canal Co. v. Chapman, 45 Idaho 380, 263 P. 45 (1927); see I.C. § 42–607 (as amended, 1969).